470 So.2d 178 (1985)
W.B. ROSEBERRY, Jr., et al., Plaintiff-Appellee,
v.
The LOUISIANA LAND & EXPLORATION CO., et al., Defendant-Appellant.
No. 16981-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1985.
Rehearing Denied June 7, 1985.
*179 Lawrence & Shaw by Wm. Paul Lawrence, II, Shreveport, for plaintiff-appellee.
Blanchard, Walker, O'Quin & Roberts by Marlin Risinger, Jr. and J. Jay Caraway, Shreveport, for defendant-appellant.
Before FRED W. JONES, Jr., NORRIS and LINDSAY, JJ.
LINDSAY, Judge.
Defendants, The Louisiana Land and Exploration Company and Cities Service Oil and Gas Corporation, appeal from the judgment of the trial court in favor of plaintiffs, W.B. Roseberry, Jr., Betty Lynn Roseberry, Estheree Roseberry McKinney and Willene Roseberry Horne, awarding the partial cancellation of an oil, gas and mineral lease on the plaintiffs' property. We affirm the judgment of the trial court for the following reasons.
On July 20, 1978, plaintiffs executed an oil, gas and mineral lease in favor of William S. Brown. The lease covered 220 acres located in Webster Parish, Louisiana, more particularly described as follows:
Township 22 North Range 9 West: Section 4-SW¼ of SE¼ and S½ of NW¼ of SE¼. Section 9-N½ of NW¼, and W½ of NE¼.
The lease provided that the primary term would be for a period of five years from November 19, 1978, and as long thereafter as oil, gas, sulphur or other minerals were being produced from the leased property or land pooled therewith or was maintained in force in any other manner provided in the lease. The standard Bath lease form contained the following inserted typewritten provision:
NOTE: This lease shall continue in force and effect beyond the primary term and any continuous drilling operations in progress at the expiration thereof, as elsewhere provided herein, only as to that acreage for which production royalties are payable, even though there be *180 one or more wells located upon the property described in this lease. This lease gives no right to explore, develope (sic) or produce any minerals other than liquid, semi-liquid or gaseous hydrocarbons and includes no rights with respect to minerals such as coal or iron ore. This lease does not cover any lands other than those specifically described in this lease. (Emphasis added)
Paragraph 6 of the lease provided in pertinent part:
This lease will continue in full force and effect within or beyond the primary term as long as any mineral is produced from said land hereunder or from land pooled therewith.... If at the expiration of the primary term ... oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith but Lessee is then engaged in drilling operations or reworking operations thereon, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in drilling operations or reworking operations with no cessation between operations or between such cessation of production and additional operations of more than ninety consecutive days: or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith....
On April 8, 1980, the lease was assigned by William Brown to defendant, The Louisiana Land and Exploration Company (hereinafter referred to as LLE). In a farmout agreement letter dated January 13, 1983, LLE assigned certain rights in the Roseberry lease to Cities Service Company (Cities Service Oil and Gas Corporation). The agreement was conditioned on the requirement that Cities Service Oil and Gas Corporation (hereinafter referred to as Cities Service) drill a well on the subleased premises or on a unit containing a portion of the sub-leased premises by November 1, 1983.
By act of formal assignment, LLE apparently assigned to Cities Service one hundred percent (100%) of its interest in a portion[1] of the Roseberry lease and conveyed sixty-six and two-thirds percent (66 2/3 %) of its interest in another portion[2] of the lease. It appears that the portion of the leased premises in which Cities Service received the 662/3% interest includes that portion of plaintiffs' property which is now in dispute.
On October 10, 1983, the Office of Conservation issued Order No. 882-D-4 establishing drilling and production units for the Smackover C Zone, Reservoir C, in the East Dykesville field, Webster Parish, Louisiana. It appears that various portions of the leased Roseberry property were included in different units established by the order.
The evidence shows that a well was spudded on the SMK C RC SU B unit, known as the Alston unit, on September 20, 1983 and the well, the Alston A-1 Well, was completed as a well capable of production on December 4, 1984. Approximately an eighty-acre portion of the Roseberry leased property is included within the Alston unit.
In early January, 1984, Cities Service commenced drilling preparations for the Cook # 1 Well, for the SMK C RC SU C unit and the well was spudded on February 2, 1984. A portion of the Roseberry tract is included within this unit. The Cook # 1 Well was completed as a commercial producer on June 1, 1984. In May, 1984, Cities Service commenced preparations for drilling the Slack # 1 Well, which was spudded on June 25, 1984. This is the unit well for SMK C RC SU D and apparently another portion of the Roseberry leased premises is included within this unit.
On February 27, 1984, plaintiffs filed the instant action for partial cancellation of the oil, gas and mineral lease. Plaintiffs alleged *181 that at the expiration of the primary term of the subject lease on November 19, 1983, drilling operations were in progress on the Alston A-1 Well which was located on property approximately three-quarters of a mile east of the leased premises. Plaintiffs alleged that under the terms of the subject lease and the special typewritten clause inserted therein, the drilling and completion of the Alston A-1 Well served to maintain the subject lease in full force and effect only as to that portion of the leased premises located within the drilling and production unit for the Alston A-1 Well. As to the remainder of the leased premises, the lease had expired.
Defendants asserted that the drilling operations on the Alston A-1 Well and the drilling operations on the Cook # 1 Well had continued with no cessation between operations of more than ninety days so as to maintain the lease in full force and effect as to the acreage affected by the lease upon which no production royalties were payable.
On May 30, 1984, defendants filed a motion for summary judgment and plaintiffs filed a counter-motion for summary judgment on June 25, 1984.
The trial court found that while the typed-in clause in the lease was somewhat vague and ambiguous, the only logical interpretation that could be given to the clause was that it in effect divided the lease upon unitization. Additionally, the trial court found the term "between operations" in Paragraph 6 of the lease referred to multiple operations on a continuous drilling operation and not to multiple wells unless a subsequent well was the result of a cessation of production or a dry hole. Therefore, the trial court found that the acreage of the lease affected by the Alston A-1 Well continued to remain under the terms of the lease but that the remaining portions of the leased premises were no longer subject to the lease. The trial court then ordered the lease cancelled as to that portion of the leased premises outside the Alston unit.
On appeal, the primary issue before this court is whether the trial court erred in finding that the typed-in clause inserted in the standard lease form in effect divided the lease between units thus resulting in the partial cancellation of the lease despite the other drilling operations.
The defendants argue that the drilling operations between the Alston A-1 Well and the Cook # 1 Well were continuous with no cessation between operations of more than ninety days. Thus, under the "continuous drilling operations clause" contained in Paragraph 6 of the lease, the lease remained in full force and effect as to the entire acreage.
LSA-R.S. 31:114 provides as follows:
A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals. A single lease may be created on two or more noncontiguous tracts of land, and operations on the land burdened by the lease or land unitized therewith sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened.
See also Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10 (1947) and LeBlanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855 (1950).
LSA-R.S. 31:3 provides that:
(u)nless expressly or impliedly prohibited from doing so, individuals may renounce or modify what is established in their favor by the provisions of this Code if the renunciation or modification does not affect the rights of others and is not contrary to the public good.
The comments following LSA-R.S. 31:114 note that under Article 3, parties are free to provide for a result other than that contemplated by Article 114. This is frequently accomplished by the inclusion of a "Pugh Clause" in the lease. The comments state that the inclusion of a "Pugh Clause" effectively reverses Hunter Co. v. Shell Oil Co., supra and LeBlanc v. Danciger Oil & Refining Co., supra, with the result that if there is unitization and production obtained from the unit, the lease is *182 maintained only as to that portion of the leased property within the unit. However, the lessee may maintain the lease as to the remainder of the premises by any other means permitted by the lease, such as delay rental payments or drilling. See Fremaux v. Buie, 212 So.2d 148 (La.App. 3rd Cir.1968).
In the instant case, a reading of the special typewritten provision inserted in the lease, although poorly drafted, reveals it was clearly intended to be a "Pugh Clause". The clause specifically states that the "... lease shall continue in force and effect beyond the primary term ... only as to that acreage for which production royalties are payable, even though there be one or more wells located upon the property ..." (Emphasis added). This clause was clearly intended to negate the general rule enumerated in LSA-R.S. 31:114 that any production on the premises would act to maintain the lease in effect over the entirety of the leasehold. Under this general rule, the location of a single well on the leased premises would serve to hold the entire mineral lease. The provision of the lease in the instant case that one or more wells located upon the property would hold the lease only as to the acreage for which production royalties were payable was an effective renunciation of this general rule.
Furthermore, the clear implication of this provision is that the lease would be divided upon unitization. Certainly, the only way that a well located on the leased premises would not generate production royalties as to all the leased acreage was if the lease had been divided into one or more units or if the well was located within a unit which did not include all of the acreage of the lease. Therefore, once the leased acreage was divided into more than one unit, the production royalties attributable to that portion of the acreage in one unit would not be sufficient to maintain the lease on the remainder of the acreage beyond the primary term.
Because the aforementioned provision of the lease had the effect of dividing the lease upon unitization, it is clear that the production on the Alston unit would not be sufficient to hold the leased acreage outside that unit beyond the primary term. Thus, had the Alston A-1 Well been in production at the end of the primary term, the lease would continue only as to that acreage included in that unit but would expire as to that acreage located outside the unit. However, as the Alston A-1 Well was not in production at the end of the primary term, the defendants must rely on some other means to maintain the lease as to all or part of the leased acreage.
As set forth earlier, in situations such as this where production has not been secured prior to the expiration of the primary term, Paragraph 6 of the lease provided in pertinent part:
If at the expiration of the primary term ... the Lessee is then engaged in drilling operations or reworking operations thereon ... this lease shall remain in force so long thereafter as Lessee ... is engaged in drilling operations or reworking operations with no cessation between operations or between such cessation of production and additional operations of more than ninety consecutive days ...
As the defendants were engaged in drilling operations at the expiration of the primary term which ultimately lead to production in the Alston Unit, it is clear that the leased acreage included within the Alston Unit would still be subject to the lease under the operation of this provision.
Defendants essentially argue that the ongoing drilling operations in the Alston unit at the expiration of the primary term acted to maintain the lease in full force and effect over all the leased acreage while the Alston A-1 Well was being completed. Defendants further argue that because the drilling of the Alston A-1 Well maintained the lease over the entire leasehold, defendants could then engage in drilling operations on the leased acreage located outside the Alston Unit, provided that no more than ninety days passed between *183 the completion of one such well and the commencement of operations upon the next well. This argument is without merit.
It is well established under Louisiana law that in interpreting the language of mineral leases, the courts should avoid interpretations which may lead to absurd consequences.[3] In the instant case, it is clear that had there been production from the Alston unit upon the expiration of the primary term, then the lease would continue only as to the acreage within the Alston unit but would terminate as to the remainder of the leased acreage. Given this fact, it would be absurd to conclude that a drilling operation conducted within the Alston unit at the expiration of the primary term would be sufficient to maintain the lease on the acreage located outside the unit. In other words, to find that the drilling operations conducted within the Alston unit would hold all of the leased acreage under the lease whereas production from the Alston unit would not, results in an absurd consequence.
The obvious intent of the inserted typewritten clause was to insure that defendants would diligently attempt to explore and develop all of the acreage encompassed within the lease. The defendants' interpretation of this clause would effectively defeat the purpose of the clause and would not be in accord with the clear intent of the parties.
In summary, the trial court did not err in finding that the special typewritten provision inserted into the lease effectively divided the leasehold upon unitization, thereby resulting in partial cancellation of the Roseberry lease. When the typewritten provision is applied in conjunction with the "continuous drilling operations" clause contained in Paragraph 6 of the lease, it is clear that the drilling operations conducted by the defendants could not act to maintain the lease over the entire leasehold.
Defendants essentially argue that a finding that the typewritten provision divides the lease upon unitization, constitutes a reformation, rather than interpretation, of the lease. Further, defendants argue that this reformation substantially modifies the lease as it appears of record thus affecting Cities Service which, as a third party, acquired an interest in the lease on the faith of public records.
It is clear that a finding that the typewritten provision divided the lease upon unitization does not constitute a reformation of the terms of the contract but rather is a reasonable interpretation of language of the lease, which interpretation should have been apparent to any party relying on the public records.
For these reasons, the judgment of the trial court in favor of plaintiffs, W.B. Roseberry, Jr., Betty Lynn Roseberry, Estheree Roseberry McKinney and Willene Roseberry Horne, and against defendants, The Louisiana Land and Exploration Company and Cities Service Oil and Gas Corporation, awarding partial cancellation of the lease is affirmed at defendants' costs.
Before HALL, FRED W. JONES, Jr., SEXTON, NORRIS and LINDSAY, JJ.
Application for rehearing denied.
HALL, J., dissents from refusal to grant rehearing and assigns reasons.
HALL, Judge, dissenting from refusal to grant a rehearing.
I respectfully dissent from the refusal to grant a rehearing in this case.
The typewritten modified Pugh clause in this lease provides, contrary to the general rule codified in LSA-R.S. 31:114, that the "lease shall continue in force and effect beyond the primary term and any continuous drilling operations in progress at the expiration thereof, as elsewhere provided herein" only as to acreage for which production royalties are payable (interpreted correctly in this court's opinion to mean only as to acreage included within a unit), even though a well is located on the leased property. The reference to continuous drilling operations as elsewhere provided herein is a reference to Paragraph 6 of *184 the Bath Form La.Spec. 14-BR1-2A-PX 10-65 lease which provides that if at the expiration of the primary term the lessee is engaged in drilling operations, the lease shall remain in force so long thereafter as lessee is engaged in "drilling or reworking operations with no cessation between operations" of more than ninety consecutive days.
The modified Pugh clause of this lease, by its own express terms, deals only with continuation of the lease beyond the primary term and any continuous drilling operations period and does not purport to divide the lease or modify its express terms as to continuation in force and effect of the entire lease during the primary term and any continuous drilling operations term. In this respect the clause in this lease is unlike the original Pugh clause, quoted in 36 Tul.L.Rev. 769, 793 and 37 Tul.L.Rev. 269, 271, which specifically provides that the commencement of operations, the drilling or reworking of a well, or production will maintain a lease in force and effect only as to acreage within the unit and does not contain the limiting reference to the period beyond the primary term and continuous drilling operations term. By referring only to continuation of the lease beyond the primary and drilling operations terms, the clause inserted in this lease necessarily implies that prior to the expiration of those terms, the lease will remain in full force and effect according to its terms and general law.
Consequently, the lease in this case was continued in full force and effect during the period that the lessee was engaged in drilling operations on the Alston well which was commenced prior to the expiration of the primary term. The decisive issue in this case, addressed by the parties in briefs but not addressed by this court's opinion, is whether the lease continued in effect after completion of the Alston well and was further continued in effect by drilling operations on the Cook well which was commenced within 90 days after completion of the Alston well and by drilling operations on the Slack well which was commenced within 90 days after completion of the Cook well. The precise determinative issue is whether the drilling operations clause of Paragraph 6 of the form lease contemplates drilling operations on successive wells or is limited in its application to drilling operations on the particular well or wells in progress at the expiration of the primary term.
I am of the opinion that a rehearing should be granted in this case to correct what I believe to be an erroneous holding that under the particular modified Pugh clause inserted in this lease the formation of units divided the lease at the time the units were formed thereby limiting or dividing the effect of the drilling operations clause, and to address and decide the decisive issue of whether the drilling operations clause applies to operations on successive wells.
NOTES
[1] W½ of NE¼ of Section 9, Township 22 North, Range 9 West.
[2] N½ of NW¼ of Section 9 and the SW¼ of SE¼ and the S½ of NW¼ of SE¼ of Section 4, Township 22 North, Range 9 West.
[3] See LSA-C.C. Art. 1945(3), now redesignated as LSA-C.C. Art. 2046, effective January 1, 1985.