1997 ND 31

**CONTINENTAL RESOURCES, INC., an Oklahoma Corporation, Plaintiff and Appellee,**

v.

**FARRAR OIL COMPANY, a Delaware Corporation, Defendant and Appellant.**

**Civil No. 960328.**

Supreme Court of North Dakota.

Feb. 27, 1997.

Lawrence Bender of Pearce & Durick, Bismarck, for Plaintiff and Appellee. Submitted on brief.

Sonna M. Anderson of Anderson & Anderson, Bismarck, and James R. Cox, Enid, OK, for Defendant and Appellant. Submitted on brief.

MESCHKE, Justice.

[¶ 1] Farrar Oil Company appealed a summary judgment declaring Continental Resources, Inc. may rightfully drill a horizontal oil and gas well through the designated subsurface formation of Farrar's separate leasehold within a force-pooled spacing unit of the Cedar Hills–Red River "B" field in Bowman County, North Dakota. We agree with the trial court that the compulsory pooling order authorizes the well and precludes Farrar's claim of subsurface trespass. We affirm.

[¶ 2] Continental holds oil and gas leases on the northwest and southeast quarters of section 17, Township 131 North, Range 103 West, Bowman County, North Dakota, within zone II of the the Cedar Hills–Red River "B" oil field. Farrar holds oil and gas leases on the northeast and southwest quarters of the same section. In September 1995, the Industrial Commission established temporary spacing in zone II of this field to be a maximum of two horizontal wells for each 640 acre unit.

[¶ 3] With this spacing ordered, Continental proposed to Farrar to drill the Hollingsworth No. 1–17 horizontal well in this section. The well would begin at a surface location in the northwest corner of Continental's northwest quarter, drill vertically to a depth of 9,200 feet, "kick off" with a horizontal leg for 4,385 feet at an azimuth of 153.5 degrees south-southeast through the Red River "B" formation under the northwest and southwest quarters, and end at a point nearly 2,640 feet from the west section line and 660 feet from the south section line.[1] Farrar refused the offer.

[¶ 4] Continental petitioned the Industrial Commission to compel pooling of all interests for the proposed well in section 17. On October 5, 1995, the Commission ordered the forced pooling of all oil and gas interests in

section 17 for the development and operation of the unit.

[¶ 5] The pooling order directed, effective on the date of first operations, the operator of a well in section 17 to conduct its operations to protect correlative rights; directed the operator to share with all interest owners, without unnecessary expense, their just, equitable, and proportionate share of production; directed each working interest owner to reimburse the operator for a proportionate share of reasonable actual costs of the well, plus a reasonable charge for supervision; and authorized the operator, if it carried a nonparticipating lessee's share of costs, to recover a risk penalty from the nonparticipating lessee. The order reserved power to the Commission to determine proper costs in the event of any dispute.

1. Horizontal wells represent a relatively recent technological advance in the oil and gas industry. Operators have discovered that drilling a wellbore horizontally along the plane of an oil and gas-bearing formation provides the opportunity to expose more of the productive zone for more efficient capture of this elusive natural resource. What truly seems phenomenal is that this technology is reviving areas that were once thought to be nearly depleted of oil and gas. Its most effective utilization to date has been in reservoirs that are highly fractured. Here, the drilling of vertical wells has always been extremely risky, being dependent upon the chance of actually drilling into such an oil-bearing fracture or gaining access to a nearby fracture through various completion techniques. Because of the geological differences between oil and gas reservoirs, there are also differences in the types of horizontal wells being drilled.
... The horizontal drilling technology which has spurred the recent drilling frenzy encompasses those wells which are initially drilled vertically, and then at some point are deviated to penetrate the target formation so as to proceed with drilling at a right angle to the vertical shaft.
... The angle of incline is not so important to today's drilling engineer as is the opportunity to use downhole, steerable drilling bits and new directional control devices. The advancement of this technology has been incredible within the past several years, enabling operators to drill longer and longer lateral extensions with better directional control.
... It is a known fact that a horizontal well recovers hydrocarbons from the reservoir much more efficiently and effectively than does a conventional [vertical] hole. It also takes fewer of them.
... It promotes the drilling of fewer wells (preventing waste) and it realizes the more efficient and economical recoveries of this nation's reserves.
Patricia A. Moore, *Horizontal Drilling—New Technology Bringing New Legal and Regulatory Challenges*, 36 Rocky Mtn.Min.L.Inst. §§ 15.01, 15.04, 15.05 (1990). Moore notes that North Dakota has been in the forefront of encouraging horizontal oil wells.
Thus, North Dakota regulations, for some purposes, define a "horizontal well" to mean "a well with a horizontal displacement of the well bore drilled at an angle of at least eighty degrees within the productive formation of at least three hundred feet [91.44 meters]." NDAC 43–02–11–01(2). A horizontal well differs from a vertical or directional well, and is often spaced differently. NDAC 43–02–03–18 fixes well locations in spacing units "[i]n the absence of an order by the commission setting spacing units for a pool." Subsections (1)(a) and (b) set well locations for vertical or directional oil wells; subsection (2)(a) and (b) do so for horizontal wells. For example, NDAC 43–02–03–18(2)(b) directs:
Horizontal wells projected to a true vertical depth of more than nine thousand feet [2743.2 meters], with a horizontal displacement of the well bore drilled at an angle of at least eighty degrees within the productive formation of at least five hundred feet [152.4 meters], must be drilled upon a tract described as two adjacent governmental quarter sections within the same section or equivalent lots, located not less than six hundred sixty feet [201.2 meters] to the outside boundary of such tract. No more than one well may be drilled to the same pool on any such tract, except by order of the commission.

[¶ 6] Despite this forced pooling order, Farrar continued to resist development. Farrar notified Continental that it would treat any penetration of its leasehold by the horizontal well bore as an illegal subsurface trespass.

[¶ 7] Continental sued Farrar for a declaratory judgment that its proposed horizontal well would not be a subsurface trespass of Farrar's leasehold. Farrar counterclaimed for a declaration that the well would trespass its leasehold. Continental moved for summary judgment, and both sides agreed no disputed material fact existed.

[¶ 8] The trial court concluded the Industrial Commission's forced pooling order was a proper exercise of the state's police power that superseded the property law of trespass. The court ruled, if Continental complied with the rules and regulations of the Industrial Commission in drilling the well, the forced pooling order would preclude any claim by Farrar against Continental for a subsurface trespass even though the horizontal hole would transect much of Farrar's leased formation in the southwest quarter. We agree.

[¶ 9] Farrar's appellate argument is perfunctory:

Without question, there will be a physical trespass of the borehole in the Hollingsworth # 1–17 well upon the leasehold interests of FARRAR. Neither the Spacing Order nor the Pooling Order entered by the Commission affecting the lands involved in this case deal with the question of trespass. It is therefore incumbent upon this Court to decide whether or not the "police power" of this State may be exerted by the Commission in enforcement of the North Dakota Oil and Gas Conservation Act to the extent necessary to supersede the private property law relating to trespass.

Without citing any precedent from elsewhere, Farrar frames the question, "as a matter of first impression in this state," to be "whether or not the 'police power' of this state may be exerted by the Commission in the enforcement of the North Dakota Oil and Gas Conservation Act to the extent necessary to supersede the private property law [of] trespass."

[¶ 10] In the beginning of the industry, oil and gas development was largely governed by traditional property law concepts, and the rule of capture prevailed. 1 Bruce M. Kramer & Patrick H. Martin *The Law of Pooling and Unitization* § 2.01 (3d ed.1996) (ch. 2, The Rule of Capture). It was thought that oil, like water, flowed in underground streams, and the law analogized the ownership of oil to the ownership of water and wild animals that could be captured when they crossed one's property. *Id.* Capturing oil and gas that migrated from another's land was lawful, but the property law of trespass precluded drilling into the subsurface of another's land to extract oil and gas. *Id.*

[¶ 11] A subsurface trespass remains defined that way:

The bottoming of a well on the land of another without his consent. Subsurface trespass results from the drilling of a "slant" or DIRECTIONAL WELL (*q.v.*), which may be intentional or inadvertent. Since subsurface trespass is as wrongful as surface trespass, the same liability attaches, *viz.*, damages in the amount of the value of the oil produced.

Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms 1211 (8th ed.1991). "The widespread adoption of the rule of capture, combined with judicial reluctance to substantially modify the rule, created significant problems for the oil and gas industry." Kramer & Martin, § 2.02. Yet the framework of the law was largely changed through extensive legislation.

While not all of the vast state regulatory programs can trace their history to the ramifications of the rule of capture, the laws relating to the prevention of waste and the compulsory pooling and unitization of oil and gas reservoirs would not have developed as rapidly and as completely had not the rule of capture gained such a strong foothold in the oil and gas jurisprudence.

Once the states, through their conservation statutes, modified the common-law rule of capture, the adoption of pooling and unitization regulatory programs was inevitable.

*Id.* (footnote omitted). Virtually all states that produce oil and gas have adopted comprehensive conservation statutes.

[¶ 12] Like other states, the North Dakota legislature recognized that traditional property law principles contributed to inefficiency and waste in oil and gas development, and so enacted an Act for the Control of Gas and Oil Resources in 1953. *See* NDCC ch. 38–08. This Resources Act declares it is

> in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas be had....

NDCC 38–08–01. The Act for the Control of Gas and Oil Resources equipped the Industrial Commission with comprehensive powers to regulate oil and gas development.

[¶ 13] The Commission has "authority over all persons and property, public and private, necessary to enforce effectively the provisions of" the Resources Act. NDCC 38–08–04. The Commission is empowered to determine whether "waste" exists or is imminent, and has the general authority to "adopt and to enforce rules and orders to effectuate the purposes and the intent of" the Resources Act. NDCC 38–08–04(5). Recognizing important physical factors affecting oil and gas production, the Commission is empowered to fix spacing units for a pool "[w]hen necessary to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights...." NDCC 38–08–07(1). Under NDCC 38–08–07(3), the Commission may fix spacing units for a pool by orders that "specify the size and shape of each unit and the location of the permitted well thereon in accordance with a reasonably uniform spacing plan."

[¶ 14] The Commission has power to compulsorily pool all interests in the spacing unit for development and operations. NDCC 38–08–08(1).

> Each such pooling order ... must be upon terms and conditions that are just and reasonable, and that afford to the owner of each tract or interest in the spacing unit the opportunity to recover or receive, with-

out unnecessary expense, his just and equitable share. Operations incident to the drilling of a well upon any portion of a spacing unit covered by a pooling order must be deemed, for all purposes, the conduct of such operations upon each separately owned tract in the drilling unit by the several owners thereof. That portion of the production allocated to each tract included in a spacing unit covered by a pooling order must, when produced, be deemed for all purposes to have been produced from such tract by a well drilled thereon.

*Id.* (part). Other parts of NDCC 38–08–08 detail how the Industrial Commission can determine cost-free royalties and cost-bearing working interests for unleased acreages that are force-pooled, can provide for the payment and recovery of reasonable actual costs of drilling and operating a well (including "a reasonable charge for supervision"), and can authorize the well owner to recover an additional risk penalty from a nonparticipating lessee.

[¶ 15] Property rights are protected by the North Dakota Constitution. *See* N.D. Const., art. I, § 1 ("inalienable rights" include "acquiring, possessing, and protecting property"); *id.* § 12 ("No person shall ... be deprived of ... property without due process of law."); *id.* § 16 ("Private property shall not be taken or damaged for public use without just compensation...."). Still, property rights are not absolute. *See,* for example, N.D. Const., art. XII, § 5:

> [T]he exercise of the police power of this state shall never be abridged, or so construed as to permit corporations to conduct their business in such a manner as to infringe the equal rights of individuals or the general well-being of the state.

Property is subject to the police power of the state "to impose such restrictions upon private rights as are practically necessary for the general welfare of all." *State v. Cromwell,* 72 N.D. 565, 9 N.W.2d 914, 919 (1943).

> [I]n the exercise of its police powers a state is not confined to matters relating strictly to the public health, morals, and peace, but ... there may be interference whenever the public interests demand it;

and in this particular a large discretion is necessarily vested in the legislature, to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests.

*Id.*

 [¶ 16] The police powers of the state are properly exercised when the Industrial Commission orders spacing or compels pooling. *See Slawson v. North Dakota Indus. Comm'n,* 339 N.W.2d 772 (N.D.1983)(Commission authorized to treat unleased mineral interest as cost-free for one-eighth when force pooling); *Hystad v. Industrial Comm'n,* 389 N.W.2d 590, 594 (N.D.1986) ("Commission has the authority to divide a pool into geographic areas (i.e. zone a pool) for non-uniform spacing units when necessary to prevent waste, avoid drilling unnecessary wells, or to protect correlative rights"); *Texaco Inc. v. Industrial Comm'n,* 448 N.W.2d 621, 624 (N.D.1989) ("giving effect to both the spacing and pooling provisions of ch. 38–08, the Commission may, within the guidelines of Section 38–08–08, N.D.C.C., issue compulsory pooling orders retroactive to the date of first operations"). The police powers exercised by the Commission here effectively superseded Farrar's right to use its oil and gas properties as Farrar pleases.

[¶ 17] Since force-pooled oil and gas operations are "deemed, for all purposes," to be the proper "conduct of such operations upon each separately owned tract in the drilling unit by the several owners thereof" under NDCC 38–08–08(1) of the Resources Act, the property law of trespass does not affect those authorized operations and, to that extent, property law is necessarily superseded. *See Union Pacific Resources Co. v. Texaco, Inc.,* 882 P.2d 212 (Wyo.1994) (Oil and Gas Conservation Commission order enlarging drilling unit superseded terms of operating agreement establishing working interest percentages of ownership in original unit); *Nunez v. Wainoco Oil & Gas Co.,* 488 So.2d 955, 964 (La.1986) ("when the Commissioner of Conservation has declared that landowners share a common interest in a reservoir of natural resources beneath their adjacent tracts, such common interest does not permit one participant to rely on a concept of individual ownership to thwart the common right

to the resource as well as the important state interest in developing its resources fully and efficiently"); *Texas Oil and Gas Corp. v. Rein,* 534 P.2d 1277, 1279 (Okla.1974) ("To hold otherwise would frustrate the intent of the [Conservation] Act because the owner desiring to drill would not be entitled to do so unless he held a lease covering the well location designated by the Commission."). To hold otherwise here, too, would frustrate the purposes of the North Dakota Resources Act and would make an Industrial Commission's forced pooling order ineffectual.

[¶ 18] We affirm the trial court's declaratory judgment that, since Continental is authorized by the Industrial Commission's forced-pooling order, it will not trespass upon Farrar's property rights by drilling the authorized horizontal well through Farrar's subsurface formation.

[¶ 19] VANDE WALLE, C.J., and MARING, NEUMANN and SANDSTROM, JJ., concur.

