2000 ND 169

**Mary M. EGELAND, Plaintiff and Appellant,**

v.

**CONTINENTAL RESOURCES, INC.; Flying J Oil & Gas, Inc.; Big West Oil & Gas, Inc.; Samedan Oil Corporation; and M.J. Armstrong, Defendants and Appellees.**

No. 20000042.

Supreme Court of North Dakota.

Sept. 14, 2000.

Michael J. Maus, Hardy, Maus & Nordsven, Dickinson, N.D., for plaintiff and appellant.

Lawrence Bender, Pearce & Durick, Bismarck, N.D., for defendants and appellees.

NEUMANN, Justice.

[¶ 1] Mary M. Egeland appealed from a summary judgment quieting title to two oil and gas leases in Continental Resources, Inc.; Flying J Oil & Gas, Inc.; Big West Oil & Gas, Inc.; Samedan Oil Corporation; and M.J. Armstrong ("the defendants"). We conclude, as a matter of law, the defendants did not breach the leases under the circumstances of this case, and we affirm.

I

[¶ 2] On March 8, 1991, Egeland entered into an oil and gas lease with Farmers Union Central Exchange, Inc. ("Cenex"), covering about 472 acres of Bowman County property. On the same date, Egeland and Donna Schaefer, individually and as trustees of the Monte A. Egeland Residuary Trust, entered into an oil and gas lease with Cenex covering another 465 acres of Bowman County property. Through various assignments, the defendants became owners of the leasehold estate under both of the Cenex leases.

[¶ 3] Both leases contained the following habendum [1] and continuous drilling opera-

---

**1.** A habendum clause sets forth "the duration of the grantee's or lessee's interest in the premises." 8 P. Martin & B. Kramer, *Williams & Meyers Oil and Gas Law Manual of Terms*, p. 479 (1999) (*"Williams & Meyers"*). *See also Olson v. Schwartz*, 345 N.W.2d 33, 36 (N.D.1984).

tions [2] clauses:

> It is agreed that this lease shall remain in force for a term of FIVE (5) years from this date, and as long thereafter as oil, gas, casinghead gas, casinghead gasoline and other hydrocarbon substance or any of them is produced from said leased premises, or drilling operations are continued as hereinafter provided. If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises but lessee is then engaged in drilling operations, then this lease shall continue in force so long as drilling operations are being continuously prosecuted on the leased premises; and drilling operations shall be considered to be continuously prosecuted if not more than sixty days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If oil or gas shall be discovered and produced from any such well or wells drilled or being drilled at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas shall be produced from the leased premises.

[¶ 4] Both leases also contained an "Exhibit A", which included a clause nullifying a preprinted "unitization clause" [3] and a form of a Pugh clause [4]:

> Notwithstanding anything contained herein to the contrary, no part or portion of the lands covered by this lease shall be committed to any unit plan of development or operation without the prior express written consent of the Lessor, her successors or assigns[.]

> A producing well, or well capable of production, will perpetuate this lease beyond its Primary Term ONLY as to those lands as are located within, or committed to, a producing or spacing unit established by Government authority having jurisdiction.

[¶ 5] The property covered by the Cenex leases is within an area designated by the Industrial Commission on June 1, 1995, as the Cedar Hills–Red River "B" Pool. The Commission established this pool for the exclusive purpose of drilling horizontal wells. Under the Commission's order, the property covered by the Cenex leases was included in five separate spacing units, and the number of horizontal wells which could be drilled on each 640–acre unit was restricted to two. Because each of the five spacing units consisted of fractional tracts, Continental Resources, Inc. ("Continental"), applied for and obtained compulsory pooling orders from the Commission for each of the five spacing units. Egeland did not consent to any of the pooling orders.

[¶ 6] Before the primary term of the Cenex leases expired on March 8, 1996, the Commission issued permits and authorized Continental to drill one well in each of the five spacing units. The Skull Creek # 1–13 well was spudded on December 19, 1995, and was completed on February 17, 1996. The Rocky # 1–18F well was spudded on February 23, 1996, and was com-

---

**2.** A continuous drilling operations clause provides that "a lease may be kept alive after the expiration of the primary term and without production by drilling operations of the type specified in the clause continuously pursued." 8 *Williams & Meyers*, p. 208.

**3.** The defendants agree the first paragraph of Exhibit A "nullifies" a "unitization clause" contained in the leases, which provided in part "Lessor agrees that the lessee or assigns may include the land covered hereby, or any part thereof, in any unit plan of development or operation as designated or approved by any Federal Law, State Law, Executive Order,

or rule or regulation prescribed by a Governmental body having jurisdiction thereof and lessor agrees to execute any such approved unit plan in order to make it effective as to the interests covered by this lease."

**4.** A Pugh clause is "a type of pooling clause which provides that drilling operations on or production from a pooled unit or units shall maintain the lease in force only as to lands included within such unit or units." 8 *Williams & Meyers*, p. 873. *See also Olson*, 345 N.W.2d at 41 n. 3 (Schneider, D.J., specially concurring).

pleted on April 13, 1996. The Schaefer # 1-24F well was spudded on March 29, 1996, and was completed on May 19, 1996. The Monte # 1-19F well was spudded on February 3, 1996, and was completed on March 19, 1996. The Clayton # 1-7 well was spudded on March 6, 1996, and was completed on April 23, 1996. The Skull Creek, Rocky and Schaefer wells were drilled on land covered by the Egeland–Cenex lease. The Monte and Clayton wells were drilled on land covered by the Residuary Trust–Cenex lease.

[¶ 7] In October 1998, Egeland sued the defendants, alleging the Cenex leases were void or should be canceled because they were either breached by the defendants or expired before producing wells on the property were drilled. The defendants counterclaimed, seeking to quiet title. The trial court denied Egeland's motion for partial summary judgment, granted the defendant's cross motion for summary judgment, dismissed Egeland's complaint in its entirety, and quieted title in the leases in the defendants. The court reasoned:

> [T]he habendum clause, the continuous drilling operations clause and the Pugh clause in each lease reveal that there is no conflict between the operation provisions of the Cenex leases. Rather, each of these clauses operates in harmony with the others. Moreover, it appears to me that Defendant[ ]s have performed all that was required or expected under the leases and that everyone has received precisely what they bargained for, no more and no less.

Egeland appealed.

## II

[¶ 8] Summary judgment under N.D.R.Civ.P. 56 is a procedural device for properly disposing of a lawsuit without trial if, after viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact or conflicting inferences which can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *Dan Nelson Construction, Inc. v. Nodland & Dickson,* 2000 ND 61, ¶ 13, 608 N.W.2d 267. A party seeking summary judgment has the burden of clearly demonstrating there is no genuine issue of material fact. *Dinger ex rel. Dinger v. Strata Corp.,* 2000 ND 41, ¶ 14, 607 N.W.2d 886.

### A

[¶ 9] Egeland contends the trial court erred in granting summary judgment in the defendants' favor because the defendants breached the Cenex leases by applying to the Commission to force pool the property without Egeland's prior written consent, which she argues constitutes committing the lands to "any unit plan of development or operation" in violation of Exhibit A of the leases.

[¶ 10] The same general rules that govern interpretation of contractual agreements apply to oil and gas leases. *Johnson v. Mineral Estate, Inc.,* 343 N.W.2d 778, 780 (N.D.1984). The construction of a written contract to determine its legal effect is a question of law for the court to decide, and on appeal, this Court will independently examine and construe the contract to determine if the trial court erred in its interpretation of it. *West v. Alpar Resources, Inc.,* 298 N.W.2d 484, 490 (N.D.1980). Words in a contract are construed in their ordinary and popular sense, unless used by the parties in a technical sense or given a special meaning by the parties. *Grynberg v. Dome Petroleum Corp.,* 1999 ND 167, ¶ 10, 599 N.W.2d 261. We also construe contracts in light of existing statutes, which become part of and are read into the contract as if those provisions were included in it. *Reed v. University of North Dakota,* 1999 ND 25, ¶ 22 n. 4, 589 N.W.2d 880. A contract must be read and considered in its entirety so that all of its provisions are taken into consideration to determine the true intent of the parties. *Miller v. Schwartz,* 354 N.W.2d 685, 688 (N.D.1984).

■ [¶ 11] At the time the Cenex leases were executed, the Commission had the statutory authority to set spacing units for a pool[5] "[w]hen necessary to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights...." N.D.C.C. § 38–08–07(1). The Commission's statutory authority is designed to further this state's policy "to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas ... to the end that the landowners, the royalty owners, the producers, and the general public realize and enjoy the greatest possible good from these vital natural resources." N.D.C.C. § 38–08–01. The Act for the Control of Gas and Oil Resources, N.D.C.C. ch. 38–08, grants the Commission comprehensive powers to regulate oil and gas development in the state, and this Court has upheld as valid exercises of the state's police powers various Commission orders spacing or compelling pooling. *See, e.g., Continental Resources, Inc. v. Farrar Oil Co.,* 1997 ND 31, ¶ 17, 559 N.W.2d 841; *Texaco Inc. v. Industrial Commission,* 448 N.W.2d 621, 624 (N.D.1989); *Hystad v. Industrial Commission,* 389 N.W.2d 590, 594 (N.D. 1986); *Slawson v. North Dakota Industrial Commission,* 339 N.W.2d 772, 777 (N.D. 1983). The Commission's powers are continuous, *Amoco Production Co.,* 307 N.W.2d at 843, and are exclusive. *Hystad v. Mid–Con Exploration Co.–Exeter,* 489 N.W.2d 571, 574 (N.D.1992).

■ [¶ 12] Pooling is authorized by N.D.C.C. § 38–08–08(1):

When two or more separately owned tracts are embraced within a spacing unit, or when there are separately owned interests in all or a part of the spacing unit, then the owners and royalty owners thereof may pool their interests for the development and operation of the spacing unit. In the absence of voluntary pooling, the commission upon the application of any interested person shall enter an order pooling all interests in the spacing unit for the development and operations thereof. Each such pooling order must be made after notice and hearing, and must be upon terms and conditions that are just and reasonable, and that afford to the owner of each tract or interest in the spacing unit the opportunity to recover or receive, without unnecessary expense, his just and equitable share.

Under this statute, pooling of a spacing unit can occur either (1) by the parties voluntarily pooling their separately owned tracts or interests, or (2) by the Commission's order entered upon the application of any interested person. Consent of an individual interest owner is relevant only under the first option. Consent is irrelevant if an interested person applies to the Commission for a pooling order.

■ [¶ 13] In this case, Continental did not voluntarily pool its interests with other owners under the first option, but applied to the Commission, as "any interested person" under the second option, for a compulsory pooling order. Although N.D.C.C. § 38–08–08(1) required that Egeland receive notice of the proceedings, the law neither requires nor provides a procedure for securing a royalty owner's consent to a forced pooling. Continental's application for forced pooling cannot be viewed as "committ[ing] to any unit plan of development or operation without the prior express written consent of the lessor ..."

---

5. Spacing and pooling are separate concepts. *Amoco Production Co. v. North Dakota Industrial Commission,* 307 N.W.2d 839, 849 (N.D. 1981). A pool is a reservoir, or a common source of supply, and constitutes a common accumulation of oil or gas, or both. *See* N.D. Admin. Code § 43–02–03–01(12) and (49). A spacing unit "is the area in each pool which is assigned to a well for drilling, producing, and proration purposes in accordance with the commission's rules or orders." N.D. Admin. Code § 43–02–03–01(52). "A spacing order standing alone without a pooling order does not operate as a de facto pooling of all fractional interests under the drillsite...." *Schank v. North American Royalties, Inc.,* 201 N.W.2d 419, 422 (N.D.1972).

within the meaning of Exhibit A of the Cenex leases. Penalizing as a breach of contract an interested person's use of the application procedure for forced pooling would inhibit use of a statutory procedure designed to implement the strong public policy of fostering the efficient development and use of the state's oil and gas resources. *See Farrar Oil,* 1997 ND 31, ¶ 16, 559 N.W.2d 841. Agreements should not be construed to be injurious to the public or against the public good. *See generally* N.D.C.C. § 9–08–01; *Muscatell v. North Dakota Real Estate Commission,* 546 N.W.2d 374, 378 (N.D.1996).

[¶ 14] Construing Exhibit A together with the existing law which became a part of the Cenex lease agreements, we conclude Continental did not breach the leases by applying to the Commission for a compulsory pooling order under N.D.C.C. § 38–08–08(1).

### B

[¶ 15] Egeland contends the trial court erred in failing to conclude the Cenex leases terminated on March 8, 1996, because of the Pugh clause contained in Exhibit A to the leases. This Court has not previously interpreted the effect of a Pugh clause on an oil and gas lease.

[¶ 16] The general rule is an oil and gas lease is indivisible by its nature. *See Shown v. Getty Oil Co.,* 645 S.W.2d 555, 560 (Tex.Ct.App.1982). Ordinarily, production from, or other operations on, any part of the land included in an oil and gas lease will perpetuate the lease beyond the primary term as to all of the land covered by the lease. *See SMK Energy Corp. v. Westchester Gas Co.,* 705 S.W.2d 174, 176 (Tex.Ct.App.1985). This situation becomes complicated by a government authority's creation of units which encompass acreage comprised of portions of several different leaseholds. *See Rougon v. Chevron, U.S.A. Inc.,* 575 F.Supp. 95, 98 (M.D.La.1983). The majority rule is governmental pooling and unitization orders do not divide a lease, and production any-

where on the pooled acreage holds all leases that may be wholly or partly in the unit. *See Mesa Petroleum Co. v. Scheib,* 726 F.2d 614, 615 (10th Cir.1984). *See also* N.D.C.C. § 38–08–08(1) ("Operations incident to the drilling of a well upon any portion of a spacing unit covered by a pooling order must be deemed, for all purposes, the conduct of such operations upon each separately owned tract in the drilling unit by the several owners thereof.") In other words, "[a] principal effect of the pooling or the unitization of a lease in most states is to preserve the entire lease even if only a portion, however small, of the lease is included in the unit." 1 B. Kramer & P. Martin, *The Law of Pooling and Unitization* § 9.01, p. 9–1 (3rd ed. 1999) (*"Pooling and Unitization"*). Pooling and unitization can therefore produce undesirable legal consequences for the lessor, whose royalty interest can be diluted by inclusion of only a portion of his leased land in a unit with land held by other interests. *See Will–Drill Resources, Inc. v. Huggs Inc.,* 738 So.2d 1196, 1200 (La.Ct.App.1999).

[¶ 17] In 1947, a Louisiana lawyer, Lawrence G. Pugh, drafted a clause, eventually named after him, which was calculated to prevent the holding of non-pooled acreage in his client's lease while certain portions of the lease acreage were being held under pooled arrangements. *See Shown,* 645 S.W.2d at 560. The main purpose of a Pugh clause "is to protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion," and the clause is designed to "foster[ ] reasonable development of leased property." *Sandefer Oil & Gas, Inc. v. Duhon,* 961 F.2d 1207, 1209 (5th Cir.1992). Although a Pugh clause generally provides for a severance of the lease where less than all of the leasehold is included in a single unit, Pugh clauses vary widely in form. *See* 4 *Williams & Meyers* 1 at § 669.14; 5 Summers, *Oil & Gas* § 960 (1966); 4 E. Kuntz, *Oil and Gas* § 48.4 (1990). To bring about a result

contrary to the general rule of indivisibility, a Pugh clause must clearly and explicitly direct a division of the lease into several parts, and direct that production on the pooled portion does not constitute production on the part not pooled. *Scheib*, 726 F.2d at 615–16. A Pugh clause cannot arise by implication. *Id.*

[¶ 18] The Pugh clause in this case provides "[a] producing well, or well capable of production, will perpetuate this lease beyond its Primary Term ONLY as to those lands as are located within, or committed to, a producing or spacing unit established by Government authority having jurisdiction." Egeland argues, because the Pugh clause provides that a producing well will perpetuate the lease beyond the primary term "ONLY" as to those lands as are located within or committed to a producing or spacing unit, and the written part of a contract controls over the pre-printed part when there is a conflict, *see* N.D.C.C. § 9–07–16, the Pugh clause conflicts with and overrides the habendum and continuous drilling operations clauses contained in the leases. According to Egeland, the net effect is that the Pugh clause operated to terminate the Cenex leases as to those lands not committed to a producing spacing unit on March 8, 1996, and because only the Skull Creek well was producing or capable of producing before March 8, 1996, the leases as to all those lands outside the spacing unit for the Skull Creek well terminated on March 8, 1996.

[¶ 19] The defendants argue there is no irreconcilable conflict between the Pugh clause and the habendum and continuous drilling operations clauses because the Pugh clause does not address drilling at the end of the primary term. Although the Pugh clause modifies the leases by providing that production on the leases extends the leases only as to the specific lands sharing in production, the defendants argue the Pugh clause does not negate the additional language in the leases allowing the leases to be extended by continuous drilling operations. According to

the defendants, the clauses, read together, required them to commence drilling operations on or before March 8, 1996 on each of the two leases and to continuously pursue those operations thereafter. Because not more than 60 days elapsed from the completion of one well and the beginning of operations on another well on each lease, the defendants argue the Cenex leases remained in full force and effect as to all lands included within a pooled spacing unit for so long as oil and gas is produced from the spacing unit.

[¶ 20] Egeland relies on three decisions from other jurisdictions to support her construction of the leases. Two of those decisions are not particularly relevant. In *Federal Land Bank v. Texaco, Inc.*, 250 Mont. 471, 820 P.2d 1269, 1273 (1991), the Montana Supreme Court held "statewide" spacing of one well per 320 acres was sufficient to constitute a spacing unit for purposes of invoking a Pugh clause. There is no dispute in this case that the actions of the Commission were sufficient to invoke the Pugh clause in the Cenex leases. The *Texaco* court also ruled the Pugh clause did not conflict with the habendum clause, but merely modified the habendum clause by terminating the lease as to lands not embraced in a producing oil and gas unit. *Id.* Because the well was actually producing before the end of the primary term, the court was not required to address the effect of the Pugh clause on the continuous drilling operations clause contained in the lease. *Id.* at 1272. In *Oswell v. Tennessee Land and Exploration Co.*, 774 F.2d 1556, 1557–58 (11th Cir.1985), the court held a typewritten rider to an oil and gas lease requiring forfeiture of "all rights and claims" to the lease was in irreconcilable conflict with, and therefore controlled over, a printed Pugh clause that exempted only a portion of the lease from forfeiture. We conclude neither *Texaco* nor *Oswell* is helpful in resolving the dispute in this case.

[¶ 21] The third case cited by Egeland is more applicable than the other two. In

*Roseberry v. Louisiana Land & Exploration Co.*, 470 So.2d 178 (La.Ct.App.1985), the lessor sued to cancel a portion of an oil and gas lease outside a producing spacing unit. The lease provided for a primary term of five years from November 19, 1978, and as long thereafter as oil or gas or other minerals were being produced from the leased property or land pooled therewith, or was maintained in force in any other manner provided in the lease. The lease contained a continuous drilling operations clause, providing if oil or gas was not being produced on the land or land pooled therewith at the expiration of the primary term "but Lessee is then engaged in drilling operations . . ., this lease shall remain in force so long thereafter as Lessee . . . is engaged in drilling operations . . . with no cessation between operations or between such cessation of production and additional operations of more than ninety consecutive days. . . ." *Id.* at 180. The lease form also contained a typewritten modified Pugh clause providing "[t]his lease shall continue in force and effect beyond the primary term and any continuous drilling operations in progress at the expiration thereof, as elsewhere provided herein, only as to that acreage for which production royalties are payable, even though there be one or more wells located upon the property described in this lease." *Id.* at 179–80.

[¶ 22] After spacing units were established by the appropriate government entity for portions of the leased property, the lessees drilled one well in each of three different spacing units. About two months before the expiration of the primary term, the lessees spudded the Alston A–1 well on September 20, 1983, and the well was completed on December 4, 1983.[6] The Cook # 1 well was spudded on February 2, 1984, and completed on June 1, 1984. The Slack # 1 well was spudded on June 25, 1984. The lessor sued, alleging drilling opera-

tions were in progress only for the Alston well at the expiration of the primary term, and those operations served to maintain the lease only as to that portion of land located within the drilling and production unit for the Alston well. As to the remainder of the leased premises, the lessor argued the lease had expired. The lessees argued drilling operations on the Alston well before the primary term expired and continuous drilling operations thereafter on the Cook and Slack wells operated to maintain the lease in full force and effect as to all lands included in the spacing units for the three wells.

[¶ 23] The trial court in *Roseberry* granted summary judgment canceling the lease as to that portion of the leased premises outside the Alston unit. The court found, while the modified Pugh clause "was somewhat vague and ambiguous, the only logical interpretation that could be given to the clause was that it in effect divided the lease upon unitization." *Roseberry*, at 181. The court also construed the term, "between operations," in the continuous drilling operations clause to refer to multiple operations on a continuous drilling operation and not to multiple wells. The court concluded the acreage of the lease affected by the Alston well continued to be subject to the terms of the lease, but the remaining portions of the leased premises were no longer subject to the lease.

[¶ 24] The Louisiana Court of Appeals affirmed, concluding the trial court did not err in ruling the modified Pugh clause divided the lease between units, resulting in the partial cancellation of the lease despite the continuous drilling operations. The court found "without merit" the lessees' argument that ongoing drilling operations in the Alston unit at the expiration of the primary term maintained the lease in full force and effect over all the leased acreage, and their continuous drilling oper-

---

6. In its statement of facts, the court listed the completion date for the Alston A–1 well as "December 4, 1984." *Roseberry*, 470 So.2d at 180. In view of the parties' arguments and the dissenting judge's rationale in *Roseberry*, we believe the 1984 date is a typographical error.

ations on the leased acreage outside the Alston unit maintained the entire lease so long as no more than 90 days passed between completion of one well and commencement of operations on another well. *Roseberry,* at 183. The court reasoned the lessees' interpretation of the modified Pugh clause would defeat its purpose of insuring that the lessees "would diligently attempt to explore and develop all of the acreage encompassed within the lease." *Id.*

[¶ 25] One judge dissented from the appellate court's refusal to grant a rehearing:

The modified Pugh clause of this lease, by its own express terms, deals only with continuation of the lease *beyond* the primary term and any continuous drilling operations period and does not purport to divide the lease or modify its express terms as to continuation in force and effect of the entire lease during the primary term and any continuous drilling operations term. . . .

Consequently, the lease in this case was continued in full force and effect during the period that the lessee was engaged in drilling operations on the Alston well which was commenced prior to the expiration of the primary term. The decisive issue in this case, addressed by the parties in briefs but not addressed by this court's opinion, is whether the lease continued in effect after completion of the Alston well and was further continued in effect by drilling operations on the Cook well which was commenced within 90 days after completion of the Alston well and by drilling operations on the Slack well which was commenced within 90 days after completion of the Cook well. The precise determinative issue is whether the drilling operations clause . . . contemplates drilling operations on successive wells or is limited in its application to drilling operations on the particular well or wells in progress at the expiration of the primary term.

*Roseberry,* at 184 (Hall, J., dissenting) (emphasis in original).

[¶ 26] The *Roseberry* case has been critiqued in 1 *Pooling and Unitization* § 9.06, at pp. 9–18—9–19:

The *Roseberry* case shows the difficulties that can be caused by inserting typewritten clauses in oil and gas leases when they must interact with other printed provisions. While the holding of the principal case is not clearly incorrect, the reading of the modified Pugh clause by the dissenting judge would also appear to have merit, even proceeding from the rationale given by the majority of the court. The majority opinion states that the "obvious intent of the inserted typewritten clause was to insure that defendants would diligently attempt to explore and develop all of the acreage encompassed within the lease. The defendants' interpretation of this clause would effectively defeat the purpose of the clause and would not be in accord with the clear intent of the parties." Here the court seems a bit wide of the mark, because, with the dissenting judge's reading of the clause, the provision would require that the defendants begin drilling within ninety days on outside acreage to keep the lease alive. The outside acreage could not be left idle even if the unit well were then producing. Thus, diligent exploration and development would also follow from the dissenting judge's position. . . .

(Footnote omitted). The *Roseberry* majority opinion tends to support Egeland's position. The *Roseberry* dissenting opinion tends to support the defendants' position.

[¶ 27] Turning to the Cenex leases at issue in this case, we agree with Egeland that the Commission's forced pooling orders invoked the Pugh clause. However, we see no irreconcilable conflict between the Pugh clause and the habendum and continuous drilling operations clauses of the lease. The Pugh clause is silent about continuous drilling operations. We reject Egeland's tortured construction that the

leases could be extended "ONLY" by production. The language of the Pugh clause provides "[a] producing well" extends the lease "ONLY as to those lands" sharing in production. The word "ONLY" limits the lands held by production from a given well, not the methods for extending the lease. Construing the leases as a whole to give effect to each of their provisions, *see Woodworth v. Chillemi*, 1999 ND 43, ¶ 9, 590 N.W.2d 446, we conclude the Pugh clauses did not terminate the Cenex leases as to those lands not committed to a producing spacing unit on March 8, 1996, and the leases could still be extended by continuous drilling operations.

[¶ 28] It is undisputed that the Skull Creek well was producing and that drilling operations were ongoing on the Rocky, Monte, and Clayton wells before expiration of the primary term. The Schaefer well, however, was spudded and completed after expiration of the primary term. The Schaefer, Skull Creek and Rocky wells were drilled on land covered by the Egeland–Cenex lease. The defendants argue the entire Egeland–Cenex lease was extended by production on the Skull Creek well and drilling operations on the Rocky well before expiration of the primary term, and the drilling operations on the Schaefer well within 60 days of the completion of the Rocky well. The defendants' argument that the continuous drilling operations clause continues to operate lease-wide, even though the Pugh clause limits the operation and effect of the habendum clause to the confines of each spacing unit, finds support in the *Roseberry* dissent. The *Roseberry* majority, however, appears to hold the Pugh clause modifies both the habendum and continuous drilling operations clauses so the continuous drilling operations clause operates only within each spacing unit, rather than on a lease-wide basis.

[¶ 29] The language of the contract governs its interpretation if the language is clear and explicit and does not involve an absurdity. N.D.C.C. § 9–07–02. We construe, as a matter of law, the continuous drilling operations clause to apply to the primary five-year term of the lease if drilling is ongoing and not more than 60 days have elapsed between completion or abandonment of one well and beginning operations for a subsequent well, and construe the Pugh clause to apply after the expiration of the primary term as extended to the entire lease by the continuous drilling operations clause. The construction urged upon us by Egeland would have a chilling effect on the covenant of reasonable development implied in every lease, a covenant recognized by this Court at least as far back as 1949. *See Hermon Hanson Oil Syndicate v. Bentz*, 77 N.D. 20, 28, 40 N.W.2d 304, 308 (1949). If the lessee is required to reasonably develop the premises but, once having drilled a well to production on one spacing unit, is faced with the prospect of having the Pugh clause terminate the lease as to any other lands except those on which the lessee might be drilling when the primary term expires, the lessee is faced with either drilling on all possible spacing units at one time or forfeiting the lease on those spacing units on which drilling is not commenced at the expiration of the primary term. Presumably a lessee will be disinclined to continue to develop a lease if the non-drilled portion of the lease will expire regardless of development during the extended primary term.

[¶ 30] We know of no case in this state holding the covenant of reasonable development requires drilling on every spacing unit in a lease simultaneously. Indeed, the construction urged on us by Egeland punishes the lessee who has developed a producing well by the expiration of the primary term as compared with the lessee who has just commenced drilling the first well at the expiration of the primary term. Under Egeland's construction of the effect of the Pugh clause, the lessee who has completed a producing well holds, in addition to the units containing producing wells, only the spacing units on which drilling operations have actually com-

menced at the expiration of the primary term. The lessee who has only commenced drilling a first well at the time of the expiration of the primary term would continue to hold the entire lease under the continuous drilling operations clause. We decline to construe the lease to reach such a result.

[¶ 31] We conclude the trial court correctly ruled the Cenex leases did not terminate under the circumstances of this case. We therefore affirm the judgment quieting title in the leases in the defendants.

## C

[¶ 32] Egeland argues, if the leases are terminated, Continental, as operator of the wells, breached its fiduciary obligations to her and owes her back royalties. Because we have ruled the leases did not terminate, it is unnecessary for us to address this issue.

## III

[¶ 33] The summary judgment is affirmed.

[¶ 34] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, DALE V. SANDSTROM, JJ., concur.