[Cite as *Yoder v. Artex Oil Co.*, 2014-Ohio-5130.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| MARION D. YODER, ET AL. | : | JUDGES: |
| | : | |
| | : | Hon. Sheila G. Farmer, P.J. |
| Plaintiffs-Appellants | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 14 CA 4 |
| | : | |
| ARTEX OIL COMPANY, ET AL. | : | |
| | : | |
| | : | |
| Defendants-Appellees | : | O P I N I O N |


CHARACTER OF PROCEEDING: Appeal from the Guernsey County Court
of Common Pleas, Case No. 12-OG-75

JUDGMENT: AFFIRMED

DATE OF JUDGMENT ENTRY: November 13, 2014

APPEARANCES:

For Plaintiffs-Appellants:

TIMOTHY B. PETTORINI
LUCAS K. PALMER
J. BENJAMIN FRAIFOGL
Critchfield, Critchfield & Johnston, Ltd.
225 N. Market St., P.O. Box 599
Wooster, OH 44691

For Defendants-Appellees:

JAMES S. HUGGINS
DANIEL P. CORCORAN
Theisen Brock
424 Second Street
Marietta, OH 45750

JOHN P. BRODY
Kegler, Brown, Hill & Ritter Co., LPA
65 East State St., Suite 1800
Columbus, OH 43215-4294

DAN BROWN
803 Steubenville Ave.
Cambridge, OH 43725

*Delaney, J.*

{¶1}  Plaintiffs-Appellants Marion D. Yoder, Reuben D. Yoder, and Esther A. Yoder appeal the January 3, 2014 judgment entry of the Guernsey County Court of Common Pleas.

**FACTS AND PROCEDURAL HISTORY**

{¶2}  Marsh Lumber Company owned acreage located in Liberty Township, Guernsey County, Ohio. On July 30, 1981, Marsh Lumber Company and LandPro, Inc. executed an oil and gas lease, which was recorded on August 3, 1981 ("Marsh Lease"). The Marsh Lease stated the lease could not be communized or unitized and specific language in the Marsh Lease permitting unitization was struck out as void.

{¶3}  In 1982, a shallow well known as Marsh No. 1 Well was drilled pursuant to the Marsh Lease. Defendant-Appellee Artex Oil Company succeeded LandPro, Inc.'s interests. In 1995, Artex took over the Marsh Lease as lessee.

{¶4}  Plaintiff-Appellant Marion D. Yoder took an interest in 95.809 acres of the Liberty Township property by virtue of a warranty deed dated May 15, 2003 and recorded July 30, 2003 ("Yoder Property"). Plaintiffs-Appellants Reuben D. Yoder and Esther A. Yoder hold a 1/8th interest in the Yoder Property by virtue of a warranty deed dated June 29, 2006 and recorded on July 11, 2006. When the Yoders took title to the Yoder Property, all of the mineral rights, including the shallow and deep rights, were encumbered by the Marsh Lease under which Artex was the lessee.

{¶5}  The Marsh Well produced oil and/or gas in 2003 and 2006.

{¶6}  On June 30, 2008, Artex entered into an oil and gas lease with the Yoders ("Yoder Lease"). The Yoder Lease granted Artex as lessee the right to investigate,

explore, prospect, drill for and produce oil, natural gas, coalbed methane gas, and any other associated hydrocarbons from the Yoder Property. The Yoder Lease covers "all formations from the top of the so called Queenston Formation and below." The pertinent terms of the Yoder Lease state as follows:

1. This lease shall remain in force for a primary term of (3) three years from this date and if lessee shall commence to drill within said primary term or extension thereof, the said lessee shall have the right to continue drilling to completion with reasonable diligence and said term shall extend as long thereafter as such drilling operations are conducted and as long as oil and gas, or either of them, is produced or is capable of being produced from said land or from a communitized unit as hereinafter provided.

* * *

9. Lessee is granted the right at any time to unitize the leased premises or any portion thereof, as to any or all strata or stratum, with any other lands for the production of oil and/or gas. No such unit shall embrace more than 160 acres, provided that if any governmental regulations or prudent geological or engineering practices shall suggest or require a spacing pattern for the development of the field, then any such unit may embrace as much additional acreage as may be included in such spacing pattern. Operations upon and production from the unit shall be treated as if such operations were upon or such production were from the premises leased hereby whether or not the well or wells are located thereon, provided,

however, that lessor shall receive, in lieu of other royalties, only such proportion of the royalties specified above as the amount of lessor's acreage placed in the unit bears to the total acreage in the unit, and provided further that lessor may take free gas from a unit well only if the well is located on lands actually owned by lessor.

* * *

15. This lease contains all of the agreements and understandings of the lessor and the lessee respecting the subject matter hereof and no implied covenants or obligations are contained herein and no verbal representations or promises have been made or relied upon by lessor or lessee supplementing or modifying this lease or as an inducement thereto.

{¶7}  On October 9, 2008, Artex applied to the Ohio Department of Natural Resources for a permit to drill a deep well on property located adjacent to the Yoder Property and owned by Aino Lutterus. Artex consolidated its interest in the oil and gas rights of the Yoder Lease with three other oil and gas leases to create a drilling unit comprised of 145.3 acres named the Lutterus-King Unit. 10.03 acres of the Yoder Property were unitized into the Lutterus-King Unit. At the time the Lutterus-King Unit was drawn, Artex used existing plat mats to determine the planned location of the Lutterus-King Unit well was located 500 feet from the boundary of the Yoder Property. The Ohio Department of Natural Resources issued the drilling permit on October 14, 2008.

{¶8}  On October 22, 2008, Artex recorded a partial release of its interest in the Marsh Lease with the Guernsey County Recorder's Office. The partial release pertained

only to those certain formations lying below the top of the so-called Queenston formation.

{¶9}  Artex commenced drilling on Lutterus No. 1 Well ("Lutterus-King Well") on November 3, 2008 and completed the drilling on November 12, 2008. The well was drilled to a depth of 7,382 feet.

{¶10} On November 17, 2008, Artex sent the Yoders a letter stating that its records indicated the Yoders were entitled to receive a portion of the oil and gas royalties derived from the Lutterus-King Well. However, before Artex could make the royalty payments, Artex asked the Yoders to sign a Division Order. The Division Order stated the undersigned certified and guaranteed they were the legal owners of and warranted the title to their respective interest in the oil and gas produced from the Lutterus-King Well. The Yoders signed the Division Order in November 2008.

{¶11} On December 4, 2008, Artex recorded with the Guernsey County Recorder's Office a Consolidation of Oil and Gas Leases to form the Lutterus-King Unit.

{¶12} The Lutterus-King Well was put into production on December 4, 2008.

{¶13} In 2009, Artex amended the size of the Lutterus-King Unit to accommodate the drilling of the second well, which would incorporate a portion of the original Lutterus-King Unit. The amended Unit for the Lutterus-King Well contained 40 acres. The portion of the Yoder Property utilized for the Unit was 2.76 acres. Under the amended Unit, the landowners retained the same percentage interest in the production from the Lutterus-King Well as under the original Unit.

{¶14} From March 15, 2009 to March 15, 2012, Artex paid the Yoders royalty payments pursuant to the terms of the Yoder Lease and the Division Order from production of the Marsh Well and the Lutterus-King Well.

{¶15} On December 6, 2011, the Yoders requested Artex to release them from the Yoder Lease. Artex declined the request.

{¶16} The Yoders filed a complaint in the Guernsey County Court of Common Pleas on February 21, 2012 against Artex and others as the current lessees under the Yoder Lease.[1] The Yoders sought declaratory judgment that the Yoder Lease terminated and/or expired by its own terms and was null and void; that Artex forfeited its rights in the Yoder Lease; that Artex abandoned any interests it had under the Yoder Lease; and the Yoder Lease was invalid and not legally binding on the Yoder Property. The Yoders also claimed breach of implied covenants, express duties, and implied duties of good faith and fair dealing, requesting the Yoder Lease be forfeited or cancelled as to the undeveloped acreage or an award of damages. The Yoders further requested that their rights to the oil, gas, and mineral interests in and underlying the Yoder Property be quieted as against Artex.

{¶17} On March 21, 2012, Artex filed their answer and counterclaim seeking a declaration that the Yoder Lease was valid.

{¶18} On July 25, 2012 and October 17, 2012, Artex and Anadarko E & P Co., LP filed motions for summary judgment. The Yoders responded to the motions for summary judgment. The trial court denied the motions for summary judgment on December 27, 2012.

---

[1] The 16 Defendants-Appellees will be collectively referred to as "Artex."

{¶19} On July 2, 2012, Artex conducted a second survey to determine the distance from the Lutterus-King Well to the Yoder Property line. The surveyor determined the distance from the Lutterus-King Well and the Yoder Property line was 498.35 feet.

{¶20} Artex filed first and second motions for partial judgment on the pleadings on July 8, 2013. In the first motion for partial judgment on the pleadings, Artex argued that pursuant to Civ.R. 12(C), the trial court should dismiss Count Two of the Yoders' complaint that stated Artex breached the implied covenants. Artex argued the Yoder Lease disclaimed all implied covenants. In the second motion for partial judgment on the pleadings, Artex argued the trial court should dismiss Count Two of the Yoders' complaint alleging breach of the implied covenant of good faith and fair dealing by unitizing a portion of the Yoder Property into the Lutterus-King Unit. Artex argued the terms of the Yoder Lease permitted unitization.

{¶21} Artex also filed a motion for judicial notice on July 8, 2013. Artex argued the trial court could take judicial notice, pursuant to Evid.R. 201, of the distance from the Lutterus-King Well to the edge of the Yoder Property. The distance was 498.35 feet.

{¶22} On July 11, 2013, Artex filed a second motion for partial summary judgment. In the motion, Artex argued there was no genuine issue of material fact that Artex did not breach the implied covenant of good faith and fair dealing by unitizing the Yoder Property into the Lutterus-King Unit. Artex also filed a third motion for summary judgment requesting judgment as a matter of law on its counterclaim. It argued there was no genuine issue of material fact that the Yoder Lease permitted unitization and the

Yoders waived breach of the lease through the Division Order and acceptance of the royalty checks.

{¶23} The Yoders responded to each of the motions. The Yoders also filed a motion for summary judgment on July 15, 2013.

{¶24} On January 3, 2014, the trial court issued a judgment entry disposing of all the pending motions. The trial court granted Artex's motion for judicial notice, first and second motions for partial judgment on the pleadings, second motion for partial summary judgment, and third motion for summary judgment. The trial court denied the Yoders' motion for summary judgment. The Yoders' complaint was dismissed and the trial court granted Artex's counterclaim to quiet title.

{¶25} It is from this decision the Yoders now appeal.

## ASSIGNMENTS OF ERROR

{¶26} The Yoders raise six Assignments of Error:

{¶27} "I. The trial court erred when it granted defendant's second motion for partial judgment on the pleadings because defendants' right to unitize the Yoder property was subject to an express duty to unitize only for the production of oil and/or gas and subject to an implied duty of good faith and fair dealing.

{¶28} "II. The trial court erred in granting defendants' first motion for partial judgment on the pleadings because the general disclaimer of implied covenants contained in the Yoder lease does not negate defendants' express obligation to unitize only for production of oil and/or gas or their obligation to act in good faith in so doing.

{¶29} "III. The trial court erred in granting defendants' third motion for summary judgment because the Yoders' execution of a division order and negotiation of certain

checks was neither an implied nor express waiver of their right to challenge bad faith unitization of the Yoder property.

{¶30} "IV. The trial court erred in granting defendant's second motion for summary judgment because a genuine issue of material fact exists as to the distance between the L-K Well No. 1 and the Yoder property and, even if the distance were not in dispute, Defendant Artex, at the time of formation of the units, was unaware that the Yoder property was required by law to be included in either the original or amended unit.

{¶31} "V. The trial court erred in granting defendants' second motion for summary judgment because a genuine issue of material fact exists as to whether a reasonable operator would exclude the Yoder property from either the original or amended unit.

{¶32} "VI. The trial court abused its discretion in taking judicial notice that the L-K Well was 498.35 feet from the Yoder property based solely upon the second survey prepared by Artex's agent, Richard Max Graves in anticipation of litigation."

**ANALYSIS**

{¶33} The Yoders argue in their first and second Assignments of Error the trial court erred in granting Artex's first and second motions for judgment on the pleadings. In the third, fourth, and fifth Assignments of Error, the Yoders argue the trial court erred in granting Artex's second and third motions for summary judgment. The sixth Assignment of Error argues the trial court erred in granting judicial notice of the distance from the Lutterus-King Well to the Yoder Property.

{¶34} The Assignments of Error involve interrelated facts and questions of law. We will discuss the issues as they arise in the analysis of whether Artex breached the Yoder Lease.

*Interpreting Oil and Gas Leases*

{¶35} With respect to oil and gas leases, the Ohio Supreme Court stated in *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129, 48 N.E. 502 (1897): "The rights and remedies of the parties to an oil and gas lease must be determined by the terms of the written instrument, and the law applicable to one form of lease may not be, and generally is not, applicable to another and different form. Such leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties."

{¶36} A contract is to be interpreted to give effect to the intention of the parties. *Morrison v. Petro Evaluation Serv.*, Inc., 5th Dist. Morrow No. 2004 CA 0004, 2005-Ohio-5640, ¶ 29 citing *Employer's Liab. Assur. Corp. v. Roehm*, 99 Ohio St. 343, 124 N.E. 223 (1919), syllabus. It is a fundamental principle in contract construction that contracts should "be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Id.* quoting *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus. "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Id.* quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361, 1997-Ohio-202, 678 N.E.2d 519.

{¶37} In order to demonstrate a breach of contract, the plaintiff must demonstrate by a preponderance of the evidence (1) that a contract existed, (2) that the

plaintiff fulfilled her obligations, (3) that the defendants failed to fulfill their obligations, and (4) that damages resulted from this failure. *Moore v. Adams*, 5th Dist. Tuscarawas No. 2007AP090066, 2008-Ohio-5953, ¶ 22.

{¶38} If there is a breach of an oil and gas lease, the remedy of forfeiture or cancellation is an equitable remedy that rests within the discretion of the trial court. *Moore* at ¶ 23. Forfeiture is an appropriate remedy when legal damages resulting in the contractual breach are inadequate; upon the breach of implied covenants; upon a claim of abandonment; or when necessary to do justice. *Id.*

*Standards of Review*

Standard of Review as to Motions for Judgment on the Pleadings

{¶39} Motions for judgment on the pleadings are governed by Civ.R. 12(C), which states: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Pursuant to Civ.R. 12(C), "dismissal is [only] appropriate where a court (1) construes the material allegations in the complaint, with all reasonable inferences to be drawn therefrom, in favor of the nonmoving party as true, and (2) finds beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief." *State ex rel. Midwest Pride IV, Inc. v. Pontious*, 75 Ohio St.3d 565, 570, 664 N.E.2d 931, 936 (1996). The very nature of a Civ.R. 12(C) motion is specifically designed for resolving solely questions of law. *See Peterson v. Teodosio*, 34 Ohio St.2d 161, 297 N.E.2d 113, 117 (1973). Reviewing courts will reverse a judgment on the pleadings if the plaintiffs can prove any set of facts that would entitle them to relief. *Flanagan v. Williams*, 87 Ohio App.3d 768, 772, 623 N.E.2d 185, 188 (1993), abrogated on other grounds by

*Simmerer v. Dabbas,* 89 Ohio St.3d 586, 2000–Ohio–232, 733 N.E.2d 1169. The review will be done independent of the trial court's analysis to determine whether the moving party was entitled to judgment as a matter of law. *Id.*

<u>Standard of Review as to Motions for Summary Judgment</u>

{¶40} We refer to Civ.R. 56(C) in reviewing a motion for summary judgment which provides, in pertinent part:

Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.* * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶41} The moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court, which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. *Dresher v. Burt,* 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). The nonmoving party then has a reciprocal burden of specificity and cannot rest on the allegations or denials in the pleadings, but must set forth "specific facts" by

the means listed in Civ.R. 56(C) showing that a "triable issue of fact" exists. *Mitseff v. Wheeler,* 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801 (1988).

{¶42} Pursuant to the above rule, a trial court may not enter summary judgment if it appears a material fact is genuinely disputed. *Vahila v. Hall,* 77 Ohio St.3d 421, 429, 674 N.E.2d 1164 (1997), citing *Dresher v. Burt,* 75 Ohio St.3d 280, 662 N.E.2d 264 (1996).

*Disclaimer of Implied Covenants*

{¶43} In its first motion for judgment on the pleadings, Artex argued it was entitled to judgment on the pleadings on Count Two of the Yoders' complaint. Count Two of the Yoders' complaint alleged Artex unitized 2.76 acres of the Yoder Property into the Lutterus-King Unit only to maintain the secondary term of the Yoder Lease. By unitizing into the Lutterus-King Unit, the Yoders alleged Artex breached the implied covenants in oil and gas leases: the implied covenant to reasonably develop, to use reasonable care and due diligence in its operations on the Yoder Property, to act as a reasonably prudent operator when conducting its operations on the Yoder Property, and the implied covenant to market.

{¶44} The first motion for judgment on the pleadings argued the Yoders could not rely upon the implied covenants in oil and gas leases pursuant to the terms of the Yoder Lease. Paragraph 15 of the Yoder Lease states:

> This lease contains all the agreements and understandings of the lessor
> and the lessee respecting the subject matter hereof and no implied
> covenants or obligations are contained herein and no verbal
> representations or promises have been made or relied upon by lessor or

lessee supplementing or modifying this lease or as an inducement thereto.

{¶45} The terms of the oil and gas lease impose obligations upon the parties, but obligations may also be imposed by operation of law. Obligations imposed by the operation of law are called "implied covenants." *Am. Energy Serv. v. Lekan*, 75 Ohio App.3d 205, 209, 598 N.E.2d 1315 (5th Dist.1992). Since the 1800s, courts have recognized the existence of implied covenants in oil and gas leases. Hall, *The Application of Oil & Gas Lease Implied Covenants in Shale Plays: Old Meets New*, 32 Energy & Min.L.Inst. (2011). The most commonly recognized implied covenants are the covenant to drill a test well, the covenant to reasonably develop, the covenant of further exploration, the covenant to protect against drainage, the covenant to diligently market, and the covenant to restore the surface. *Id.*

{¶46} Parties to an oil and gas lease may disclaim implied covenants in the terms of the lease, so that only the provisions contained in the lease govern the obligations of the parties. Ohio courts consistently enforce express provisions in leases that disclaim implied covenants. *Bilbaran Farm, Inc. v. Bakerwell, Inc.*, 2013-Ohio-2487, 993 N.E.2d 795, ¶ 18 (5th Dist.) quoting *Bushman v. MFC Drilling Inc.*, 9th Dist. Medina No. 2403-M, 1995 WL 434409 (July 19, 1995). In referring to the implied covenant to reasonably develop the leased property, the Ohio Supreme Court stated, "[t]he implied covenant arises only when the lease is silent on the subject." *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 128, 48 N.E. 502 (1897).

{¶47} Paragraph 15 of the Yoder Lease states that "no implied covenants or obligations are contained herein." Paragraph 15 of the Yoder Lease expressly disclaims

all implied covenants, thereby rendering the obligations of the parties to be governed by the terms of the Yoder Lease, not by operation of law. The Yoders' claim that Artex breached the terms of the Yoder Lease by violating certain implied covenants cannot be sustained pursuant to the express disclaimer of implied covenants contained in the Yoder Lease.

*Good Faith and Fair Dealing*

{¶48} In the second motion for judgment on the pleadings, Artex argued it was entitled to judgment on Count Two of the Yoders' complaint. Count Two of the Yoders' complaint argued Artex breached certain implied covenants, but it also claimed that Artex breached the implied covenant of good faith and fair dealing by unitizing the Yoder Property into the Lutterus-King Unit.

{¶49} The first issue to resolve is whether Ohio law recognizes an implied covenant of good faith and fair dealing as to oil and gas leases. In *Taylor v. MFC Drilling, Inc.*, 4th Dist. Hocking No. 94CA14, 1995 WL 89710 (Feb. 27, 1995), the Fourth District analyzed whether the appellees breached an implied covenant of fair dealing by including only six acres of the appellant's property in a development unit. The appellant alleged the appellees were draining oil and gas from the 100 acres owned by appellant but the 100 acres were not part of the development unit. The court stated that it could not find any Ohio case law that specifically recognized an implied covenant of fair dealing in mineral leases. *Id.* at *2. The court found the nature of the appellant's complaint fell within the implied covenant to reasonably develop the leased premises. *Id.*

{¶50} The Yoders concede it is not clear under Ohio case law whether there is an implied covenant of good faith and fair dealing as to oil and gas leases. The Yoders argue, however, because the oil and gas lease is a contract, there is the obligation of good faith in the performance of the contract. Because there is no Ohio case law on the issue of an implied covenant of good faith and fair dealing as to oil and gas leases, we begin our analysis with outside resources.

{¶51} Secondary sources examining implied covenants in oil and gas leases have found that contractual concepts, such as good faith and fair dealing, apply to the interpretation of the oil and gas lease. The oil and gas lease was historically seen as a transaction between two parties with unequal bargaining powers -- an unsophisticated farmer negotiating with an oil and gas corporation. *See* Merrill, *The Law Relating to Covenants Implied in Oil and Gas Leases* 1926 (2d Ed 1940 & Supp. 1964); Pierce, *The Renaissance of Law in the Law of Oil and Gas: The Contract Dimension*, 42 Washburn Law Journal 909 (2004). Implied covenants, such as the implied covenant to protect against drainage, focused on protecting the leasehold estate. Hardymon, *Adrift on the Implied Covenant to Market: Regulation by Implication*, 24 Energy & Min.L.Inst. 8 (2004). However, because of the nature of the oil and gas lease, courts also focused on the conduct of the parties to the oil and gas lease by applying contractually-based covenants such as good faith and fair dealing to the oil and gas lease. Hall, *The Application of Oil & Gas Lease Implied Covenants in Shale Plays: Old Meets New*, 32 Energy & Min.L.Inst. 8 (2011). Courts used implied covenants to fill the gaps in contracts and promote fairness and cooperation between the lessor and lessee. *Id.*

{¶52} Turning back to Ohio case law, the Supreme Court in *Harris v. Ohio Oil Co.* held that an oil and gas lease is a contract and should be interpreted as such. Also under Ohio case law, it is well-established that every contract has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract. *PHH Mortg. Corp. v. Ramsey*, 10th Dist. Franklin No. 13AP-925, 2014-Ohio-3519, -- N.E.3d --, ¶ 33 citing *Littlejohn v. Parrish,* 163 Ohio App.3d 456, 2005-Ohio-4850, 839 N.E.2d 49, ¶ 21 (1st Dist.). " 'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " *Id.* at ¶ 26, quoting Restatement of the Law 2d, Contracts, Section 205, Comment a (1981). Based on the foregoing, it can be logically concluded that an oil and gas lease is a contract, and because it is a contract, an oil and gas lease is subject to the implied covenant of good faith and fair dealing.

{¶53} The next question is whether the parties can disclaim the implied covenant of good faith and fair dealing through an express waiver of all implied covenants in the oil and gas lease. This Court could find no Ohio case law in the realm of contract law or oil and gas law addressing this issue. At the time of authoring this opinion, only one federal district court case was discovered that addressed this question and in the end, the court found that the answer was not necessary for its determination of the appeal:

> But these principles do not answer one of the questions presented in this case: may the parties to a contract by a single term wholesale disclaim the implied covenant of good faith and fair dealing and thereby foreclose its use for any purpose by a court construing a contract? The first issue is to

discern the parties' intent in including this provision. Then, assuming it manifests an intent to strip a court of the ability to use the implied covenant as an interpretive tool, the next issue is whether such a result would offend the public policy of New York. While it may be convenient to view the implied covenant as embodying virtue and, literally, goodness, it has not been met so warmly in some of the literature and one author has suggested that it may not be needed in view of other modern interpretive tools. [ ] Fortunately, the Court need not reach the question at this juncture because, even if it is assumed that the covenant should be implied despite the contractual carve-out, the result on this motion is not altered.

*In Touch Concepts, Inc. v. Cellco Partnership*, 949 F.Supp.2d 447, 467 (S.D.N.Y.2013) , 2013 WL 6182949 (Nov. 18, 2013). Fortunately, like the *In Touch Concepts* court, this court need not reach the question at this juncture because even if it is assumed the implied covenant of good faith and fair dealing cannot be waived, the result of the within appeal is not changed based on the application of the plain and unambiguous contractual language of the Yoder Lease.

*Unitization of the Yoder Property into the Lutterus-King Unit*

{¶54} Count Two of the Yoders' complaint alleges Artex unitized the Yoder Property into the Lutterus-King Unit in bad faith as pretext for holding the lease acreage. The Yoders contend Artex breached the Yoder Lease by failing to unitize the Yoder Lease pursuant to the express terms of the lease. The unitization provision of the Yoder Lease states as follows:

9. Lessee is granted the right at any time to unitize the leased premises or any portion thereof, as to any or all strata or stratum, with any other lands for the production of oil and/or gas. No such unit shall embrace more than 160 acres, provided that if any governmental regulations or prudent geological or engineering practices shall suggest or require a spacing pattern for the development of the field, then any such unit may embrace as much additional acreage as may be included in such spacing pattern. Operations upon and production from the unit shall be treated as if such operations were upon or such production were from the premises leased hereby whether or not the well or wells are located thereon, provided, however, that lessor shall receive, in lieu of other royalties, only such proportion of the royalties specified above as the amount of lessor's acreage placed in the unit bears to the total acreage in the unit, and provided further that lessor may take free gas from a unit well only if the well is located on lands actually owned by lessor.

Plain Language of the Yoder Lease Permits Unitization

{¶55} Because the Yoder Lease is a contract, we first look to the contractual language to determine the intent of the parties as to unitization. The Yoder Lease specifically addresses unitization in Paragraph 9. It states in pertinent part: "Lessee is granted the right at any time to unitize the leased premises or any portion thereof, as to any or all strata or stratum, with any other lands for the production of oil and/or gas." The plain language of the Yoder Lease grants Artex the right to unitize any portion of the Yoder Property with any other lands for the production of oil and/or gas.

{¶56} There is no factual dispute the Lutterus-King Well is used for the production of oil and/or gas. The Civ.R. 56 evidence shows that the Yoders have received royalty payments from the oil and/or gas produced from the Lutterus-King Well. The Yoders argue, however, Artex did not unitize the Yoder Property "for the production of oil and/or gas," but rather for the purpose of holding onto the Yoder Lease through the secondary term of the habendum clause. The Yoders contend the distance of the Lutterus-King Well from the Yoder Property evidences Artex's bad faith in unitizing the Yoder Property.

<u>Distance from the Lutterus-King Well is 498.35 Feet</u>

{¶57} Ohio law regulates how Artex must drill a deep well. The Lutterus-King Well was drilled to a depth of 7,382 feet. Ohio Adm.Code 1501:9-1-04 governs where a deep well may be located:

(C) Location of wells:

* * *

(4) No permit shall be issued to drill, deepen, reopen, or plug back a well for the production of the oil or gas from pools from four thousand feet or deeper unless the proposed well is located: (a) Upon a tract or drilling unit containing not less than forty acres; (b) Not less than one thousand feet from any well drilling to, producing from, or capable of producing from the same pool; *(c) Not less than five hundred feet from any boundary of the subject tract or drilling unit.* (Emphasis added.)

{¶58} In 2008, at the time of the permit application for the Lutterus-King Well, Artex utilized plat maps to determine the Lutterus-King Well was located 500 feet from

the boundary of the Yoder Property. Richard Dailey, president of Dailey Land Professionals, Inc., provided land related services to Artex. Dailey testified in his deposition:

Q. Is it accurate to say, given that it was at that point believed to be 500 feet from the boundary, you had this choice whether to include the Yoder lease into this unit or not?

A. Legally, we would have had a choice in that the state minimum spacing says that we need a minimum of 500 feet. But as a matter of practice, I try in my determination for well units not to use hard cut-offs of 500 feet because of the errors that you can get where a stake is moved a few feet in a field by a rig hand or something, or the maps --. Clearly, when you're looking at a paper map, the property line drawn on a map isn't necessarily the property line in the field, or the fence line which could be moved five or ten feet in the field. So a paper map is hard to distinguish where a true property corner is. You never know a true property corner till the surveyor goes out and actually establishes it on the field. So we normally do not cut off our drilling units at 500 feet, just as a matter of good business practice. We try to err on the side of caution and include additional property.

Q. And is that why the Yoder lease was included?

A. It was included because of those parameters, the fact that we had the right to pull, the lease pursuant to the terms of the lease, and because of geologic parameters that are proprietary.

(Dailey Depo., p. 57-58).

{¶59} On July 2, 2012, Richard Graves, a licensed surveyor, performed a survey for Artex on the Lutterus-King Unit. The survey showed the distance from the Lutterus-King Well to the edge of the Yoder Property was 498.35 feet.

{¶60} Artex filed a motion for judicial notice of the distance from the Lutterus-King Well to the Yoder Property as 498.35 feet. The trial court granted the motion in its January 3, 2014 judgment entry. The Yoders argue in their sixth Assignment of Error that the trial court erred in granting the motion for judicial notice because there was a dispute of fact as to the distance.

{¶61} The taking of judicial notice is governed by Evid.R. 201. Under Evid.R. 201(B), the trial court may take judicial notice of facts that is "one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." We review decisions by a trial court regarding judicial notice under an abuse of discretion standard. *Enviropro Plastics, Inc. v. Trickett*, 5th Dist. Stark No. 2013 CA 00195, 2014-Ohio-1707, ¶ 46 citing *Molitor v. Gaddis*, 5th Dist. Morrow No. CA 875, 1999 WL 770688 (Aug. 25, 1999).

{¶62} The Yoders argue the distance from the Lutterus-King Well and the Yoder Property is a fact subject to a reasonable dispute because Artex measured the distance as both 500 feet and 498.35 feet. In Artex's second motion for summary judgment, Artex argued there was no genuine issue of material fact as to the distance between the Yoder Property and the Lutterus-King Well. Artex provided the affidavit of Richard Max Graves who conducted a survey of the property and measured the distance between the Yoder Property and the Lutterus-King Well as being 498.35 feet. The Yoders have

not provided any rebuttal evidence to the measurement of the distance between the Yoder Property and the Lutterus-King Well.

{¶63} While the Yoders may have an argument as to whether the trial court abused its discretion when it granted the motion for judicial notice as to the measurement, we find that argument to be moot based on Artex's second motion for summary judgment. Artex provided Civ.R. 56 evidence to demonstrate there was no genuine issue of material fact as to the distance between the Lutterus-King Well and the Yoder Property. Dailey testified the first measurement was based on plat maps. Dailey testified that after a well is drilled, the projected distance can change because of the drilling process. Graves testified the second measurement was based on an actual survey of the property after the well was drilled. Upon our de novo review, we find that reasonable minds could only conclude the distance between the Yoder Property and the Lutterus-King Well is 498.35 feet.

{¶64} The distance of the Yoder Property from the Lutterus-King Well required Artex to include the Yoder Property into the Lutterus-King Unit in order to comply with Ohio state law. Further, the clear language of Paragraph 9 of the Yoder Lease contemplates state regulation as to spacing requirements:

> No such unit shall embrace more than 160 acres, provided that if any governmental regulations or prudent geological or engineering practices shall suggest or require a spacing pattern for the development of the field, then any such unit may embrace as much additional acreage as may be included in such spacing pattern.

Unitization Maintains the Habendum Clause of the Yoder Lease

{¶65} The unitization provision of the Yoder Lease states:

Operations upon and production from the unit shall be treated as if such operations were upon or such production were from the premises leased hereby whether or not the well or wells are located thereon, provided, however, that lessor shall receive, in lieu of other royalties, only such proportion of the royalties specified above as the amount of lessor's acreage placed in the unit bears to the total acreage in the unit, and provided further that lessor may take free gas from a unit well only if the well is located on lands actually owned by lessor.

{¶66} The habendum clause of the Yoder Lease states:

1. This lease shall remain in force for a primary term of (3) three years from this date and if lessee shall commence to drill within said primary term or extension thereof, the said lessee shall have the right to continue drilling to completion with reasonable diligence *and said term shall extend as long thereafter as such drilling operations are conducted and as long as oil and gas, or either of them, is produced or is capable of being produced from said land or from a communitized unit as hereinafter provided.* (Emphasis added.)

{¶67} There is no dispute of fact the Yoders are receiving a percentage of royalties from production of the Lutterus-King Well based on the percentage of the acreage in the Lutterus-King Unit. The plain language of the habendum clause and the

unitization clause supports Artex's argument the incorporation of the Yoder Property into the Lutterus-King Unit was proper.

### A Prudent Operator Would Include the Yoder Property

{¶68} The Yoders argue in their fifth Assignment of Error that no reasonable prudent operator would include the Yoder Property into the Lutterus-King Unit. The reasonable prudent operator standard in oil and gas cases is similar to the reasonable person standard in tort cases. It is the "standard by which all actions taken by the lessee in the production and operation of the wells on the leasehold are judged." Hardymon, *Adrift on the Implied Covenant to Market: Regulation by Implication*, 24 Energy & Min.L.Inst. 8.02 (2004). Research shows that few Ohio cases mention the standard, but they do not develop the standard. *See Holonko v. H.D. Collins*, 7th Dist. Mahoning No. 87 C.A. 120, 1988 WL 70900 (June 29, 1988); *State v. Baldwin Producing Corp.*, 10th Dist. Franklin No. 76AP-892, 1977 WL 199981 (March 10, 1977); *Rayl v. East Ohio Gas Company*, 46 Ohio App.2d 167, 348 N.E.2d 385 (9th Dist.1973).

{¶69} When applied, the reasonable prudent operator standard is utilized to judge whether the lessee was completing the implied covenants to explore, develop, produce, and market as any reasonably prudent operator would do under the circumstances. *Rayl, supra* at 171. The reasonable prudent operator standard "may not be an implied covenant *per se*, but an overreaching standard of performance with which the lessee must comply in fulfilling all of his obligations, express or implied." Hardymon, *supra* at 8.02.

{¶70} In this case, we find that reasonable minds could only conclude that based on the plain language of the Yoder Lease, the distance of the Yoder Property from the

Lutterus-King Well, and the state law requirements for drilling a deep well, a prudent operator would include the Yoder Property into the Lutterus-King Unit.

Acceptance of Royalty Payments Does Not Equate Ratification of Unitization

{¶71} Artex argued in its third Motion for Summary Judgment that the Yoders waived their breach of contract claims because they accepted royalty payments from production of oil and/or gas from the Lutterus-King Well. The Seventh District Court of Appeals held in *Price v. K.A. Brown Oil and Gas, L.L.C.*, 7th Dist. Monroe No. 13 MO 13, 2014-Ohio-2298, ¶ 25, that the acceptance of royalty payments pursuant to an oil and gas lease does not result in a lessor from being estopped from asserting a breach under a lease because the lessor is entitled to the benefit. *See also Harding v. Viking Internatl. Resources Co., Inc.,* 2013–Ohio–5236, 1 N.E.3d 872 (4th Dist.).

{¶72} The holding in *Price* could also be argued to negate Artex's argument that the Division Order signed by the Yoders estopped the Yoders from arguing a forfeiture of the Yoder Lease. The language of the Division Order stated Artex's records indicated the Yoders were entitled to receive a portion of the oil and gas royalties derived from the Lutterus-King Well pursuant to the terms and conditions of the oil and gas leases that were included in the Lutterus-King Unit. However, before Artex could make the royalty payments, Artex asked the Yoders to sign a Division Order. The Division Order stated the undersigned certified and guaranteed they were the legal owners of and warranted the title to their respective interest in the oil and gas produced from the Lutterus-King Well. The Division Order appears to be a confirmation of the benefits the Yoders were entitled to, such as royalty payments, pursuant to the terms of the Yoder Lease. Reviewing this issue is a light most favorable to the Yoders, we do not find the

acceptance of royalty payments or the Division Order waived the Yoders' claims of breach of the Yoder Lease.

{¶73} The Yoders' third Assignment of Error is sustained. Our finding as to this issue, however, does not change our ultimate judgment.

## CONCLUSION

*The Plain Language of the Yoder Lease and the Civ.R. 56 Evidence Support Unitization*

{¶74} Upon our de novo review of the questions of law and the Civ.R. 56 evidence, we find the language of the Yoder Lease supports the unitization of the Yoder Property into the Lutterus-King Unit. Reasonable minds could only conclude from the Civ.R. 56 evidence that Artex acted as a reasonably prudent operator when it included the Yoder Property into the Lutterus-King Unit.

{¶75} The trial court did not err in finding judgment in favor of Artex and against the Yoders.

{¶76} The Yoders' first, second, fourth, and fifth Assignments of Error are overruled. The Yoders' third and sixth Assignments of Error are sustained. Our decision to the third and sixth Assignments of Error does not affect our judgment that the trial court correctly granted judgment in favor of Artex.

{¶77} The judgment of the Guernsey County Court of Common Pleas is affirmed.

By: Delaney, J.,

Farmer, P.J. and.

Baldwin, J., concur.