[Cite as *Summitcrest, Inc. v. Eric Petroleum Corp.*, 2016-Ohio-888.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| SUMMITCREST, INC. | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| CROSS-APPELLANT | ) | CASE NO. 12 CO 0055 |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| ERIC PETROLEUM CORP., ET AL. | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS | ) | |
| CROSS-APPELLEES | ) | |

CHARACTER OF PROCEEDINGS:        Civil Appeal from Court of Common
                                 Pleas of Columbiana County, Ohio
                                 Case No. 2011 CV 745

JUDGMENT:                        Affirmed in part.
                                 Reversed and Modified.

APPEARANCES:
For Plaintiff-Appellee/Cross-Appellant        Attorney Bruce Khula
                                              Attorney Steven Friedman
                                              4900 Key Tower
                                              127 Public Square
                                              Cleveland, Ohio 44114-1304

For   Defendant-Appellant/Cross-Appellee      Attorney Thomas Hill
Eric Petroleum Corporation                    6075 Silica Road, Suite A
                                              Austintown, Ohio 44515-1053

For Defendants-Appellants                     Attorney Thomas Fusonie
Chesapeake Exploration, LLC and               52 East Gay Street
Ohio Buckeye Energy, LLC                      P.O. Box 1008
                                              Columbus, Ohio 43216-1008

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Cheryl L. Waite

                                              Dated: March 4, 2016

DeGENARO, J.

**{¶1}** Defendant-Appellant, Eric Petroleum Corporation (EPC) appeals the judgments of the Columbiana County Court of Common Pleas granting partial summary judgment in favor of Appellee Summitcrest, Inc., which 1) determined that the oil and gas lease between the parties had terminated with regard to lands outside of the 1-35 well unit, pursuant to a Pugh Clause in the Lease; 2) determined that the 1-35 well unit size was 640 acres; and 3) equitably tolled the lease as to the 640 acre 1-35 unit, but not the remaining outside lands, the remaining 2,094.496 acres.

**{¶2}** EPC asserts that the trial court misinterpreted and misapplied the Lease's Pugh Clause and erroneously determined the Lease had terminated with regard to the outside lands. EPC further argues that the trial court should have equitably tolled the lease as to the entire lease acreage. Summitcrest has filed a separate cross-appeal in this matter, challenging the trial court's determination that the unit size of the 1-35 well is 640 acres, instead of 40 acres.

**{¶3}** EPC's assignments of error are meritorious. The Pugh Clause did not apply because the Lease was still in its primary term as extended, and the trial court should have equitably tolled the Lease for the entire acreage, not just the 1-35 unit.

**{¶4}** With regard to the cross-appeal, Summitcrest's assignment of error is meritless because EPC properly increased the size of the 1-35 unit from 40 acres to 640 acres pursuant to the terms of the Lease agreement and Ohio law and should be entitled to the benefit of its bargain. Accordingly, the judgment of the trial court is reversed and modified so as to toll the primary term as to the entire 2,734 acres, and the case remanded for further proceedings.

## Facts and Procedural History

**{¶5}** Summitcrest is the owner of approximately 2,734 acres of land in Columbiana County, Ohio. On April 24, 2004, Summitcrest as lessor entered into an oil and gas lease of the property with Mason Dixon Energy, Inc. as lessee. A memorandum of the lease agreement was duly recorded with the office of the Columbiana County Recorder.

**{¶6}** The Lease's habendum clause at paragraph 1 provides that it shall

remain in force for a primary term of five years and "as long thereafter as oil or gas, or either of them, is produced from said land by the Lessee, its successors and assigns." The habendum clause further provides that the primary term can be extended one time for five more years upon paying Summitcrest an agreed-upon sum before the original expiration date of the primary term.

{¶7}    Paragraph 6 of the Lease is a Pooling Clause which provides:

> Pooling. Lessee hereby is given the right at its option, at any time within the primary term hereof or at any time during which this lease may be extended by any provision hereof, and from time to time within such period, to pool, reform, enlarge, and/or reduce such unit or pool, and repool all or any part or parts of leased premises or rights therewith with any other land in the vicinity thereof, or with any leasehold, operating, or other rights or interests in such other land so as to create units of such size and surface acreage as Lessee may desire but containing not more than eighty (80) acres for an oil well and not more than six hundred forty (640) acres for a gas well plus in each case a ten percent (10%) acreage tolerance. If at any time larger units are specified under any then applicable law, rule, regulation, or order of any governmental authority for the drilling, completion or operation of a well, or for obtaining maximum allowable, [sic] any such unit may be established or enlarged to conform to the size authorized. Each unit or reformation thereof may be created by governmental authority or by recording in the appropriate county office a Declaration containing a description of the pooled acreage. Any well which is commenced, or is drilled, or is producing on any part of any land theretofore or thereafter so pooled shall, except for the payments of royalties, be considered a well commenced, drilled, and producing on leased premises under this lease. There shall be allocated to the portion of leased premises included in any such pooling or repooling such proportion of the actual production from all lands so pooled or repooled as such portion of leased premises, computed on an acreage basis, bears to the entire acreage of the lands so pooled or repooled. The production so allocated shall be considered for the purpose of payment or delivery of royalty to be the entire production from the portion of leased premises included in such pooling or repooling in the same manner as though produced from such portion of leased premises under the terms of this lease. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be land, oil, and gas rights, royalty, and/or leasehold interests in land within the unite [sic] which are not pooled or unitized, or even though there may be a failure

of the leasehold title (in whole or in part), to any tract or interest therein included in a pooled unit.

**{¶8}** A typewritten Addendum is attached to and incorporated into the Lease. At paragraph 19 it states: "The provisions of this Addendum are expressly made a part of the oil and gas lease and if there is a conflict between the provisions set out in this Addendum and any of the provisions in the oil and gas lease, the provisions contained in this Addendum shall apply and take precedence over any clause contained in this oil and gas lease, notwithstanding anything to the contrary."

**{¶9}** Paragraph 24 of the Addendum is a Pugh Clause and provides[1]:

Continuous Development. At the expiration of the primary term and any extension thereof and at all times thereafter when oil and gas ceases to be produced in paying quantities (hereafter called "Termination Date"), this Lease shall terminate as to any portion of the Leased Premises located outside of the surface boundaries of any unit (hereinafter referred to as "outside lands") on which is located a well producing from a zone or zones included in such unit or on which is located a shut-in gas well completed in a zone or zones included in such unit. In the foregoing sentence and in [Paragraph 6] the term "unit" shall refer to the larger of (i) any unit declared under [Paragraph 6] of this Lease and/or (ii) any spacing or pro-ration unit prescribed or permitted by the applicable governmental regulatory authority. If on the Termination Date Lessee is then engaged in the drilling of a well on the Leased Premises or if Lessee has within less than 90 days prior to the Termination Date completed/abandoned a well on the Leased Premises, this Lease shall not terminate as to said outside lands so long as Lessee continues to diligently drill wells on the Leased Premises with no lapse of more than one (1) year between the completion/abandonment of a well and the commencement of drilling operations for an additional well. Subject to the provisions of [Paragraph 5] if at any time Lessee allows a period in excess of one (1) year to elapse between the completion/abandonment of a well and the commencement of actual drilling operations on an additional well, this Lease shall terminate as to the outside lands. The terms "completion/ abandonment" and "completed/abandoned" shall mean the date the rig used for drilling and/or working over the well had been released. Lessee shall promptly execute and file of record a Release of all such

---

[1] The parties agreed and the trial court found that the Pugh Clause contains several scrivener's errors; throughout this opinion the correct paragraph numbers will be bracketed.

outside lands as to which this Lease has terminated, as provided in this Lease.

**{¶10}** Paragraph 5 of the Lease is an Operations Clause which provides:

If prior to discovery and production of oil or gas, on the leased premises or on acreage pooled therewith, Lessee should drill a dry hole or holes thereon or, if after discovery and production of oil or gas, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences operations for drilling, deepening, plugging back, or reworking within ninety (90) days thereafter or if it be within the primary term, commences or resumes the payment or tender of delay rentals or commences operations for drilling, deepening, plugging back, or reworking on or before the delay rental paying date next ensuing after the expiration of ninety (90) days from date if (sic) completion of a dry hole or cessation of production. If at any time subsequent to ninety (90) days prior to the beginning of the last year of the primary term and prior to the discovery and production of oil or gas on the leased premises or on acreage pooled therewith, Lessee should drill a dry hole thereon, no delay rental payment or operations are necessary in order to keep this lease in force during the remainder of the primary term. If at the expiration of the primary term, oil or gas is not being produced on the leased premises or on acreage pooled therewith, but Lessee is engaged in drilling, deepening, plugging back or reworking operations thereon or shall have completed a dry hole thereon within ninety (90) days prior to the end of the primary term, this lease shall remain in force so long as operations on said well, or for the drilling, deepening, plugging back, or reworking of any additional well, are prosecuted with no cessation of more than ninety (90) consecutive days and, if they result in the production of oil or gas, so long thereafter as oil or gas is produced from the leased premises, or open (sic) acreage pooled therewith.

**{¶11}** Following the execution of the Lease with Summitcrest, Mason Dixon assigned its rights to Burlington Resources Oil and Gas Company, LP. Thereafter, Burlington applied for a permit from the Ohio Department of Natural Resources resulting in well No. 1-35 being drilled on the Property.

**{¶12}** The 1-35 well was completed in 2004 as a 40 acre unit, and produced natural gas in 2008, 2009 and 2010. The 1-35 well is the only well that has been drilled on the Property.

**{¶13}** In 2007, Burlington assigned its interest in the Lease to EPC. In December 2008, EPC exercised the option to extend the primary term of the Lease for an additional five years and made a renewal payment to Summitcrest of $27,344.96. This extended the primary term of the Lease until April 14, 2014.

**{¶14}** In April 2009, EPC declared its intention to increase the size of the 1-35 well from 40 acres to a 640 acre unit.

**{¶15}** In July 2010, EPC assigned a portion of its interest to Ohio Buckeye Energy, LLC, an entity affiliated with Chesapeake Exploration, LLC; this assigned portion was for deep rights.

**{¶16}** In September 2010, Summitcrest deemed the Lease forfeited and recorded an Affidavit of Non-Compliance alleging violation of implied covenants under the Lease by EPC, and filed an Affidavit of Forfeiture the following month.

**{¶17}** On or about August 8, 2011, Chesapeake filed an application with ODNR for permits to drill additional wells on the Property and the permit was granted on August 22, 2011. By letter dated August 25, 2011, Chesapeake notified Summitcrest of its intention to drill a new well on 10 acres of the Property beginning on or about September 15, 2011. On September 26, 2011, Ohio Buckeye assigned its interests in the Lease to Chesapeake.

**{¶18}** Summitcrest filed the present declaratory judgment action seeking a declaration that the Lease had terminated because the 1-35 well was not producing in paying quantities; alternatively seeking a declaration that the Lease terminated as to the lands located outside of the boundaries of the 1-35 well unit by operation of the Pugh Clause. Finally, Summitcrest sought a declaration that EPC's exercise in April 2009 of its option to increase the unit size for the 1-35 well from 40 to 640 acres was invalid and unenforceable.

**{¶19}** Chesapeake and Ohio Buckeye filed their joint answer and counterclaim seeking damages for breach of contract and a declaratory judgment for equitable tolling of the Lease term. EPC filed an answer and counterclaim, seeking damages against Summitcrest for breach of contract and slander of title. It appears

EPC's counterclaims remain pending in the trial court.

{¶20} Cross motions for partial summary judgment were then filed by Chesapeake/Ohio Buckeye and Summitcrest. Chesapeake argued that the 1-35 well was still producing in paying quantities and that the portion of the Lease governing the acreage outside of the boundaries of the 1-35 well unit had not terminated since the Lease was still in its primary term.

{¶21} Summitcrest offered no evidence to controvert Chesapeake's and EPC's position on the paying quantities issue, and the trial court found the 1-35 well was producing in paying quantities.

{¶22} However with regard to the Pugh Clause, Summitcrest argued that it clearly and unambiguously provides that the Lease had terminated as to the lands outside the existing 40 acre well unit. Alternatively, Summitcrest argued that if the provision was ambiguous that parol evidence established that the intent and purpose of paragraph 24 was to ensure the continuous development of the land by obligating the lessee, upon drilling of its first well, to drill at least one new well during every one-year period or suffer termination of the lease as to the outside lands.

{¶23} EPC opposed Summitcrest's motion, asserting that Summitcrest was reading the language of Paragraph 24 out of context and that the Pugh Clause could have no application until the end of the primary term of the Lease, as extended, a date which had not yet come to pass.

{¶24} Because Summitcrest ultimately settled with Chesapeake/Ohio Buckeye and any appeals as to these three parties were dismissed, the only procedural history pertinent to this appeal concerns Summitcrest and EPC

{¶25} The trial court then issued a series of judgments addressing the pending motions for partial summary judgment. First, it ruled the portion of the Lease governing the acreage outside of the boundaries of the 1-35 well unit—the outside lands—had expired. The trial court reached this conclusion by determining the Pugh Clause had *two* potential triggers: 1) the Termination Date, defined in the first sentence of the clause as "the expiration of the primary term and any extension

thereof and at all times thereafter when oil and gas ceases to be produced in paying quantities," and 2) "at any time"—*even* during the primary term—as stated in the fourth sentence of the clause.

**{¶26}** The trial court entered a second judgment determining the 1-35 well unit contained 640 acres as a matter of law, thereby quantifying the outside lands as approximately 2,094 acres.

**{¶27}** The trial court then proceeded to permit the parties to revisit the issue of the equitable tolling of the primary lease term. Summitcrest filed a motion for partial summary judgment concerning that issue which Chesapeake opposed. The trial court issued a judgment ordering the equitable tolling of the Lease as to the 640 acre unit associated with the 1-35 well, but not as to the outside lands acreage, and ordering that the Lease term as to the 640 acre unit would be tolled for a period of time commensurate with the duration of the appeal of the trial court's judgment, calculated from September 11, 2012.

### Pugh Clause

**{¶28}** In its first of two assignments of error, EPC asserts:

The Trial Court erred in granting Plaintiff-Appellee, Summitcrest, Inc.'s 3-5-2012 Motion for Partial Summary Judgment (8-13-2012 J.E. at p. 13, as incorporated in its 11-21-2012 J.E. at p. 1) when it applied the Pugh Clause of the oil and gas lease out of context, as to both the paragraph in which it is included and the contract as a whole, so as to order the revesting in the surface owner/lessor of 2,094.496 acres, which includes both Defendant-Appellant, Eric Petroleum Corporation's fee simple determinable estate in the oil and gas between the surface and the top of the Queenston formation (approx. 6,342 feet), and Chesapeake Exploration, LLC's rights below that depth, prior to the expiration of, and therefore during, the lease's primary term.

**{¶29}** When reviewing a trial court's summary judgment, an appellate court

applies a de novo review. *Parenti v. Goodyear Tire & Rubber Co.*, 66 Ohio App.3d 826, 829, 586 N.E.2d 1121 (9th Dist.1990). Under Civ.R. 56, summary judgment is only proper when the movant demonstrates that, viewing the evidence most strongly in favor of the nonmovant, reasonable minds must conclude no genuine issue as to any material fact remains to be litigated and the moving party is entitled to judgment as a matter of law. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390, 738 N.E.2d 1243 (2000). Further, "[t]he construction of written contracts and instruments of conveyance is a matter of law." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus, quoting *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996).

{¶30} Essentially, a Pugh Clause protects the lessor from a situation where a large tract of land is held under the lease by virtue of oil or gas production on a very small portion. *See generally Egeland v. Continental Resources, Inc.*, 2000 ND 169, 616 N.W.2d 861, ¶17, citing *Sandefer Oil & Gas, Inc. v. Duhon*, 961 F.2d 1207, 1209 (5th Cir.1992). The Pugh Clause therefore maintains a lease only as to that part of the lease acreage actually producing and severs producing units from non-producing units, despite the fact that leased lands are normally considered indivisible. *See Bibler Bros. Timber Corp. v. Tojac Minerals, Inc.,* 281 Ark. 431, 435, 664 S.W.2d 472 (1984). EPC argues that the trial court erred in its interpretation of this clause.

{¶31} Oil and gas leases are contracts. "A contract is defined by the words written within the four corners of the document." *Cleveland Mack Leasing, Ltd. v. Chef's Classics, Inc.*, 7th Dist. No. 05 MA 59, 2006–Ohio–888, ¶ 19. "When the language of a contract is clear and unambiguous, and not subject to multiple interpretations, the court will not consider extrinsic evidence, i.e., evidence outside the four corners of the document, to re-interpret the contract's terms." *Love v. Beck Energy Corp.*, 7th Dist. No. 14 NO 415, 2015–Ohio–1283, ¶ 21, citing *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St.3d 635, 597 N.E.2d 499 (1992), syllabus. Here, both parties assert, and the trial court agreed, that paragraph 24 is unambiguous.

**{¶32}**  The Pugh Clause provides in pertinent part:

> Continuous Development. **At the expiration of the primary term and any extension thereof** and at all times thereafter when oil and gas ceases to be produced in paying quantities (hereafter called "Termination Date"), this Lease shall terminate as to any portion of the Leased Premises located outside of the surface boundaries of any unit (hereinafter referred to as "outside lands") on which is located a well producing from a zone or zones included in such unit or on which is located a shut-in gas well completed in a zone or zones included in such unit. * * * If on the Termination Date Lessee is then engaged in the drilling of a well on the Leased Premises or if Lessee has within less than 90 days prior to the Termination Date completed/abandoned a well on the Leased Premises, this Lease shall not terminate as to said outside lands so long as Lessee continues to diligently drill wells on the Leased Premises with no lapse of more than one (1) year between the completion/abandonment of a well and the commencement of drilling operations for an additional well.* * * Subject to the provisions of [Paragraph 5, the Operations Clause] if at any time Lessee allows a period in excess of one (1) year to elapse between the completion/abandonment of a well and the commencement of actual drilling operations on an additional well, this Lease shall terminate as to the outside lands. The terms "completion/ abandonment" and "completed/abandoned" shall mean the date the rig used for drilling and/or working over the well had been released. Lessee shall promptly execute and file of record a Release of all such outside lands as to which this Lease has terminated, as provided in this Lease. (Emphasis added)

**{¶33}**  The trial court concluded the following with regard to paragraph 24: "By virtue of this unambiguous language the Pugh Clause expressly states the Lease Agreement *shall* terminate as to the outside lands if *at any time* the lessee allows a period in excess of one (1) year to elapse between the completion/abandonment of a well and the commencement of actual drilling operations on an additional well." (Emphasis sic.)

**{¶34}**  In other words, the trial court determined there were two potential triggers for application of the Pugh Clause; first, the termination date as defined in the clause's first sentence and quoted above.  Secondly, and contradictorily, the trial court determined the clause could be triggered at any time—*even during the primary*

*term*—based upon language parsed out of the fourth sentence of the clause.

**{¶35}** The trial court's interpretation is incorrect. First, the trial court read the fourth sentence in a vacuum, instead of reading it in harmony with the rest of paragraph 24. Even where contracts are unambiguous, courts still must adhere to the maxim that "when possible, a court's construction of a contract should attempt to harmonize all the provisions of the document rather than to produce conflict in them." *Love, supra*, 7th Dist. No. 14 NO 415, at ¶ 21, citing *Pierce Point Cinema 10, L.L.C. v. Perin–Tyler Family Found., L.L.C.*, 12th Dist. No. CA2012–02–014, 2012–Ohio–5008, ¶ 11, citing *Farmers Natl. Bank v. Delaware Ins. Co.*, 83 Ohio St. 309, 337, 94 N.E. 834 (1911).

**{¶36}** The trial court's focus on the words "at any time" in the fourth sentence was made without consideration of the topical sentence of the paragraph, dictating its application only at the Termination Date. Nor does the trial court explain how to reconcile the first and third sentences of paragraph 24, with its reading of the fourth sentence, concluding the first and third sentences are subject to the Termination Date, whereas the fourth sentence applies at any time. This reading of the fourth sentence eviscerates the third sentence, creating an internal inconsistency within the Pugh Clause.

**{¶37}** Moreover, the trial court's interpretation that the Pugh Clause can be triggered at any time thwarts the maxim that every word in a contract should be given meaning; no word should be construed as surplusage. *See Cincinnati v. Gas Light & Coke Co.*, 53 Ohio St. 278, 285, 41 N.E. 239 (1895) ("In determining the rights of parties under a written contract, it is * * * the duty of a court to * * * construe and enforce the contract according to its evident meaning, giving force to every word."); *Sunoco Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶54; *Seneca Valley, Inc. v. Village of Caldwell*, 156 Ohio App.3d 628, 2004-Ohio-1730, 808 N.E.2d 422, ¶42 (7th Dist.).

**{¶38}** More importantly, the trial court's interpretation renders the habendum clause of the lease meaningless. Habendum clauses such as this one have two

parts: a primary term and a secondary term. Here, during the primary term, the Lessee has no production requirements. Once that term has expired, the Lease is kept alive by oil and gas production in paying quantities. As stated in *Am. Energy Serv. v. Lekan*, 75 Ohio App.3d 205, 598 N.E.2d 1315 (5th Dist.1992), the habendum clause is "two tiered. The first tier, or primary term, is of definite duration * * *. The second tier is of indefinite duration and operates to extend the Lessee's rights under the lease so long as the conditions of the secondary term are met." *Id.* at 212, cited with approval in *State ex rel. Claugus Family Farm, L.P. v. Seventh Dist. Court of Appeals,* 2016-Ohio-178, --- N.E.3d ---, ¶20, and *Chesapeake Exploration, L.L.C. v. Buell*, 2015-Ohio-4551, --- N.E.3d ---, ¶ 77.

**{¶39}** It is a long-standing maxim that contracts "should be construed reasonably, so as not to arrive at absurd results." *Felton v. Nationwide Mut. Fire Ins. Co.*, 163 Ohio App.3d 436, 441, 2005-Ohio-4792, 839 N.E.2d 34, 37, ¶ 18 (9th Dist.), *quoting Budai v. Euclid Spiral Paper Tube Corp.*, 9th Dist. No. 96CA0046, 1997 WL 28111, *9 (Jan. 22, 1997), citing *Cincinnati v. Cameron*, 33 Ohio St. 336, 364 (1878). The trial court's interpretation of the Pugh Clause creates an absurd result; if correct, this would render the primary term superfluous. Further, there would have been no purpose in EPC paying a substantial sum to extend the primary term for the entire leasehold acreage in 2008, if the Pugh Clause would have already terminated the Lease as to outside lands long before that—as early as 2005, since the only well was drilled in 2004.

**{¶40}** Summitcrest points to the fact that paragraph 19 provides that if there is a conflict between the provisions set out in the Addendum, which includes the Pugh Clause, and any of the provisions in the lease, "the provisions contained in this Addendum shall apply and take precedence over any clause contained in this oil and gas lease, notwithstanding anything to the contrary." However, paragraph 19 does not destroy the fact that all lease provisions, where not clearly in conflict, should still be read in harmony with one another. *See Love, supra*, 7th Dist. No. 14 NO 415, at ¶ 21.

**{¶41}** Thus, the fourth sentence of the Pugh Clause must be read as part of the overall scheme presented in the Addendum and in harmony with the lease as a whole, to the extent it does not expressly conflict with other Lease provisions. The Termination Date is the only trigger for all Pugh Clause provisions. Accordingly, it does not apply during the primary term or any extension thereof. The fourth sentence of the Pugh Clause, merely reiterates that, subject to the provisions in the Operations Clause, "if at any time Lessee allows a period in excess of one (1) year to elapse between the completion/abandonment of a well and the commencement of actual drilling operations on an additional well, this Lease shall terminate as to the outside lands." "At any time," means at any time after the primary term or an extension thereof ends.

**{¶42}** In sum, the trial court's interpretation of paragraph 24 was erroneous. The Pugh Clause does not apply during the primary term or any extension thereof. At the time the Lease was challenged, it was still in the primary term, because EPC paid $27,344.96 to extend the primary term. Therefore, the trial court erred in concluding the Lease terminated as to lands outside the 1-35 unit. Accordingly, EPC's first assignment of error is meritorious.

## Equitable Tolling

**{¶43}** In its second and final assignment of error, EPC asserts:

The Trial Court erred in granting, in part, Plaintiff-Appellee, Summitcrest, Inc.'s 10-29-2012 Motion for Partial Summary Judgment (11-21-2012 J.E. at p. 9) when it agreed to equitably toll the term of the oil and gas lease as concerns the 640 acres attributable to the 1-35 well, but refused to equitably toll the lease as to the balance of 2,094.496 acres.

**{¶44}** Equitable tolling of the lease term is by its very nature an equitable remedy. Equitable tolling of the terms of oil and gas leases may be employed by courts to preserve the status quo where the validity of those leases is challenged.

*See, e.g.*, *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1341 (10th Cir.1982). The remedy prevents leases from expiring on their own terms while the outcome of litigation challenging the lease is decided by the courts. *Id.*

**{¶45}** When reviewing a trial court's summary judgment, an appellate court applies a de novo review. *Parenti, supra* at 829. On the other hand, the standard of review regarding claims for equitable relief is typically abuse of discretion. *McCarthy v. Lippitt*, 150 Ohio App.3d 367, 2002-Ohio-6435, 781 N.E.2d 1023, ¶ 22 (7th Dist.). "An abuse of discretion means an error in judgment involving a decision that is unreasonable based upon the record; that the appellate court merely may have reached a different result is not enough." *Downie v. Montgomery*, 7th Dist. No. 12 CO 43, 2013–Ohio–5552, ¶ 50. Under either standard of review, the trial court's tolling decision was erroneous.

**{¶46}** Courts have concluded that "where plaintiff has placed a cloud on the title of a leasehold by seeking judicial cancellation of the lease, a court may, in fairness to the lessee, toll the running of the lease terms." *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1341 (10th Cir.1982). *See also H&G Fossil Fuels Co., v. Roach*, 103 N.M. 793, 795-797, 715 P.2d 66 (1986) (reversing lower court's refusal to toll lease).

**{¶47}** There are not many Ohio cases discussing equitable tolling. However, a line of federal district court cases were discussed in *Allton v. Chesapeake Exploration*, LLC, S.D.Ohio No. 2:14-CV-1685, 2015 WL 1396439, (Mar. 25, 2015):

> In *Kelich v. Hess Corp.*, No. 13–cv–140 (S.D. Ohio April 15, 2014) (Watson, J.), the Court granted a motion to toll the term of a lease after having determined that the lease was valid but had automatically terminated at the end of its initial term. He noted that "should the Sixth Circuit overturn the Court's decision and find that the Lease did not terminate, Hess may very well have already lost the time under the Lease for which it bargained and paid for, which is the very

justification under Ohio law for tolling a Lease." [2]

> In *Chesapeake Exploration, L.L.C. v. McClain*, No. 2:13–cv–445, Doc. No. 30 (S.D.Ohio July 30, 2013) (Frost, J.), the plaintiff challenged the validity of a lease during its primary term, based on allegedly invalid execution. Granting the motion to toll "at a highly preliminary stage" of the lawsuit, the Court found that the defendant "need not prove its entire case now," and "[i]t suffices ... to show that the [plaintiffs] have challenged the validity of the Lease and that such as challenge has prevented [the defendant] from developing its leasehold interest."

*Allton* at *3.

**{¶48}** However, the Ohio Supreme Court recently considered the propriety of an equitable tolling in order to maintain the status quo during the pendency of an appeal. *State ex rel. Claugus, supra.* In *Claugus* the landowners prevailed in the trial court in challenging the validity of the lease, and on appeal this court, pursuant to a motion filed under Civ.R. 62(D) and App.R. 7(A), equitably tolled the lease terms during the pendency of the appeals process. The Supreme Court denied writs of mandamus and prohibition challenging the validity of this court's equitable tolling order. *Claugus* at ¶ 34-40.

**{¶49}** Here, the trial court tolled the primary term of the lease only as to the 640-acre 1-35 well unit commencing September 11, 2012, but declined to toll the Lease as to the remaining acreage. In order to preserve the status quo, the trial court should have tolled the primary term of the lease as to the entire disputed acreage. It was unreasonable to toll the lease as to the 1-35 unit acreage only.

**{¶50}** Thus, EPC's second assignment of error is meritorious. Pursuant to App.R. 12(A)(1)(a) the trial court's judgment entry is modified so that the Lease is equitably tolled as to the entire 2,734.496 acres, not just the 640 acres contained in

---

[2] Notably, the Sixth Circuit *did* end up reversing the trial court's decision on the lease's validity, which demonstrates the importance of the decision to toll. *See Kelich v. Hess Corp.,* 6th Cir. No. 14-3411, 2014 WL 7331014, *2 (Dec. 23, 2014)

the 1-35 well unit. Accordingly, EPC's second assignment of error is meritorious.

## Cross-Appeal: Unit Size of 1-35 Well

**{¶51}** In its sole assignment of error in its cross-appeal, Summitcrest asserts:

In its Order dated September 13, 2012 (hereinafter 'Interim Order #2'), the trial court improperly granted partial summary judgment in favor of Defendant-Appellant/Cross-Appellee Eric Petroleum Corporation ('Eric Petroleum') and against Plaintiff-Appellee/Cross-Appellant Summitcrest, Inc. ('Summitcrest') by determining that, for purposes of Eric Petroleum's rights under a certain 2004 oil and gas lease (the 'Lease'), the unit size of the #1-35 Well situated on Summitcrest's property in Columbiana County (the #1-35 Well') constituted 640 acres, instead of 40 acres.

**{¶52}** Summitcrest first argues that by its plain terms, the Lease does not permit EPC to repool and increase the number of acres in a production well solely within Summitcrest's Property, as it attempted to do here. Rather, Summitcrest claims that Paragraph 6 requires the lessee to pool the leased premises with "other land in the vicinity," i.e., property separate from that leased from Summitcrest. EPC counters that it acted appropriately; it argues that the unit size was properly increased pursuant to the Lease provisions and Ohio law.

**{¶53}** Paragraph 19 of the Lease provides that the Addendum will control over any potentially conflicting terms in the rest of the Lease. The Pugh Clause, which is in the Addendum, states in relevant part: "In the foregoing sentence and in [Paragraph 6] the term "unit" shall refer to the larger of (i) any unit declared under [Paragraph 6] of this Lease and/or (ii) any spacing or proration unit prescribed or permitted by the applicable governmental regulatory authority * * *."

**{¶54}** As a result of the language in the Pugh Clause, the word "unit" may be read in Paragraph 6 to mean either a unit declared under the terms of Paragraph 6, which provides for pooling with other lands, *or* a spacing or proration unit prescribed

or permitted by the applicable governmental regulatory authority. Accordingly, when EPC is given the right in Paragraph 6 during the extended primary term "to pool, reform, enlarge and/or reduce such unit or pool," it is given the right to enlarge both a unit declared under Paragraph 6 of the Lease, and/or "any spacing or proration unit prescribed or permitted by the applicable governmental regulatory authority."

**{¶55}** Here EPC exercised the option to extend the primary term of the Lease for an additional five years and paid Summitcrest a renewal payment of $27,344.96. Thereafter, EPC declared its intention to revise the existing 1-35 well unit from 40 acres to 640 acres, by recording a unit declaration with the county recorder's office, pursuant to Paragraph 6 and the Pugh Clause. ODNR thereafter permitted the unit increase. Thus, EPC's recorded unit declaration and ODNR's approval of the unit increase are valid under the terms of the Lease.

**{¶56}** Second, Summitcrest argues that EPC is bound by an implied covenant of good faith and fair dealing, requiring not only honesty but also reasonableness in the enforcement of the Lease. According to Summitcrest, EPC breached this implied covenant when it "sought expansion of the unit size for no constructive reason beyond wishing to increase its minimally productive footprint on Summitcrest's property." The trial court declined to impose an implied covenant concluding "that the express language of the written Lease Agreement negates the imposition of an implied covenant of good faith and fair dealing controlling a unit size increase * * * ."

**{¶57}** Summitcrest argues that the trial court misinterpreted Ohio case law on the implied covenant of good faith and fair dealing and erred by concluding that EPC did not breach this covenant.

**{¶58}** Although this court has not addressed whether the implied covenant of good faith and fair dealing applies to oil and gas leases, the Fifth District explained:

> Secondary sources examining implied covenants in oil and gas leases have found that contractual concepts, such as good faith and fair dealing, apply to the interpretation of the oil and gas lease. The oil and gas lease was historically seen as a transaction between two parties

with unequal bargaining powers-an unsophisticated farmer negotiating with an oil and gas corporation. *See* Merrill, *The Law Relating to Covenants Implied in Oil and Gas Leases* 1926 (2d Ed 1940 & Supp.1964); Pierce, *The Renaissance of Law in the Law of Oil and Gas: The Contract Dimension*, 42 Washburn Law Journal 909 (2004). Implied covenants, such as the implied covenant to protect against drainage, focused on protecting the leasehold estate. Hardymon, *Adrift on the Implied Covenant to Market: Regulation by Implication*, 24 Energy & Min.L.Inst. 8 (2004). However, because of the nature of the oil and gas lease, courts also focused on the conduct of the parties to the oil and gas lease by applying contractually-based covenants such as good faith and fair dealing to the oil and gas lease. Hall, *The Application of Oil & Gas Lease Implied Covenants in Shale Plays: Old Meets New*, 32 Energy & Min.L.Inst. 8 (2011). Courts used implied covenants to fill the gaps in contracts and promote fairness and cooperation between the lessor and lessee. *Id.*

Turning back to Ohio case law, the Supreme Court in *Harris v. Ohio Oil Co.* held that an oil and gas lease is a contract and should be interpreted as such. Also under Ohio case law, it is well-established that every contract has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract. *PHH Mortg. Corp. v. Ramsey*, 10th Dist. Franklin No. 13AP–925, 2014–Ohio–3519, [17 N.E.3d 629], ¶ 33 citing *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005–Ohio–4850, 839 N.E.2d 49, ¶ 21 (1st Dist.). " 'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " *Id.* at ¶ 26, 839 N.E.2d 49, quoting Restatement of the Law 2d, Contracts, Section 205, Comment a (1981). Based on the foregoing, it can be

logically concluded that an oil and gas lease is a contract, and because it is a contract, an oil and gas lease is subject to the implied covenant of good faith and fair dealing.

*Yoder v. Artex Oil Co.*, 5th Dist. No. 14 CA 4, 2014-Ohio-5130, ¶51-52.

**{¶59}** The *Yoder* court declined to rule on whether parties can disclaim the implied covenant of good faith and fair dealing through an express waiver of all implied covenants in the oil and gas lease. *Id.* at ¶53-56. Moreover, the Lease here does not include an express waiver. But as in *Yoder*, the plain language of the Lease here permits the unitization and therefore there can be no breach of the implied covenant of good faith and fair dealing. *See id.* at ¶53-77.

**{¶60}** "[G]ood faith is not an invitation for a court to decide whether one party ought to have exercised privileges expressly reserved in the document." *McClure v. Northwest Ohio Cardiology Consultants, Inc.*, 6th Dist. No. 2012-Ohio-1106, ¶27. And "merely realizing the benefit of its bargain * * * does not constitute 'bad faith." *Id. See also Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443, 662 N.E.2d 1074 (1996) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' * * * ['Good faith'] is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document").

**{¶61}** Here, as the trial court found, EPC properly increased the size of the 1-35 well unit from 40 acres to 640 acres pursuant to the terms of the Lease and is entitled to the benefit of its bargain. Accordingly, Summitcrest's sole assignment of error in its cross-appeal is meritless.

## Conclusion

**{¶62}** EPC's first assignment of error is meritorious; the Pugh Clause did not apply because the Lease was still in its primary term, as extended. EPC's second assignment of error is meritorious; the trial court should have equitably tolled the Lease as to the entire disputed acreage, not just the 1-35 unit. With regard to the

cross-appeal, Summitcrest's assignment of error is meritless.

{¶63} Accordingly, the judgment of the trial court is reversed and the trial court's judgment is modified so as to toll the primary term for the entire 2,734 acres.

Donofrio, P. J., concurs.

Waite, J., concurs.